(PRIZE.)

*The Commercen.*—LINDGREN, *Claimant.*

Provisions, neutral property, but the growth of the enemy's country, and destined for the supply of the enemy's military or naval forces, are contraband.

Provisions, neutral property, and the growth of a neutral country, destined for the general supply of human life in the enemy's country, are not contraband.

Freight is never due to the neutral carrier of contraband.

*Quære,* in what cases the vehicle of contraband is confiscable?

A neutral ship, laden with provisions, enemy's property, and the growth of the enemy's country, specially permitted to be exported for the supply of his forces, is not entitled to freight.

It makes no difference in such a case, that the enemy is carrying on a distinct war, in conjunction with his allies, who are friends of the captor's country, and that the provisions are intended for the supply of his troops engaged in that war, and that the ship in which they are transported belongs to subjects of one of those allies.

APPEAL from the circuit court for the district of Massachusetts. This was the case of a Swedish

vessel captured on the 16th of April, 1814, by the
private armed schooner Lawrence, on a voyage from
Limerick, in Ireland, to Bilboa, in Spain. The car-
go consisted of barley and oats, the property of
British subjects, the exportation of which is general-
ly prohibited by the British government; and, as
well by the official papers of the custom-house, as
by the private letters of the shippers, it appears to
have been shipped under the special permission of
the government, for the sole use of his Britannic ma-
jesty's forces then in Spain. Bonds were accord-
ingly given for the fulfilment of this object. At the
hearing in the district court of Maine, the cargo was
condemned as enemy's property, and the vessel re-
stored, with an allowance, among other things, of
the freight for the voyage, according to the stipula-
tion of the charter-party. The captors appealed
from so much of the sentence as decreed freight to
the neutral ship; and, upon the appeal to the circuit
court of Massachusetts, the decree, as to freight,
was reversed, and from this last sentence an appeal
was prosecuted to this court.

*Key*, for the appellant and claimants. 1. The ge-
neral principle of law allows freight to the neutral
carrier of enemy's property. It is incumbent upon
the captors to show, that this case forms an excep-
tion to the rule, which they can only do by alleging
this to be an unlawful interposition in the war be-
tween the United States and Great Britain; but an
interposition in the Peninsular war, was not necessa-
rily an interposition in the American war. Were it

1816.<br>The<br>Commerce.

1816.

The
Commercen.

so, it would follow that the Spaniards and Swedes might not trade with the United States, they being the allies of Great Britain; as the prize courts of England decide, that the subjects of an ally cannot lawfully trade with the common enemy. *Bynker-shoek* puts the case of two powers allied during a truce, but before enemies:[a] What would be the situation of neutrals? If they came to the assistance of either, they might be liable to be treated as enemies by the other. In the present instance, *if the British forces had been so situated as that they might operate against the United States as well as France, it would alter the case.* But remote and uncertain consequences cannot be held to affect the conduct of neutrals with illegality. 2. There is no proof or presumption that the master knew the special destination of the cargo. His act cannot be unlawful, unless done knowingly and wilfully, as in the case of carrying enemy's despatches, where Sir William Scott at first went entirely on the ground of the master's privity; afterwards he adopted a rule more strict and severe; but still knowledge was held to be necessary, and presumed wherever there was a want of extraordinary diligence on the part of the master. It is conceded that the *onus* is on the claimant to show his ignorance of the contents of the papers concerning the cargo, which, if the present testimony is not sufficient, may be done upon farther proof.

a *Q. J. Pub. L.* 16. p. 125. of Du Ponceau's Translation.

[STORY, J. Ignorance of the master was not pre-
tended in the court below.]

*Dexter*, for the respondents and captors. The
rule, that the neutral carrier of enemy's property is
entitled to freight, is a mitigated rule, and *Bynker-
shoek* argues with much force against its reasonable-
ness.[b] But the master, in the present case, is not
entitled to the benefit of it, having, by his conduct,
made himself an enemy, *pro hac vice.* The principle,
as to the nature of the Spanish war, was settled
when the court determined that to carry goods to
Lisbon, under a British license, was cause of con-
fiscation. Can a party in a similar predicament be
entitled to freight? Can a neutral stand on any
better ground than a citizen? Either the British
troops in the peninsula were enemies or friends? If
enemies, this is an interposition which cannot be per-
mitted to neutrals. Being at war, the British fleets
and armies were hostile in every quarter of the globe.
Where shall the line be drawn to mark when they
became our enemies? At what period from the
time of their landing in Portugal, until their crossing
the Pyrennees, and embarking at Bordeaux for the
United States? It is impossible to aid the operations
of our enemy in any part of the world, without
strengthening his means of annoying us. The very
men fed by this trade came here to fight us on our
own soil, and to destroy our capital. It is said that
this involves the consequence that we were at war

b Q. J. Pub. C. 14. p. 111. of Du Ponceau's Translation.

with Spain and Portugal; but it depends upon the councils of every country to judge what acts of hostility shall render it expedient to make war; it depended on us to be at war with the allies of our declared enemy. It is a general rule that it is not unlawful to carry provisions to a neutral country; but if the enemy be there, and the articles are destined for his use, it is unlawful. The whole evidence shows that the master knew he was carrying provisions for the supply of the British forces, and his ignorance of the law is immaterial. But even if it were material, the inflamed rate of freight shows that he was conscious of the risk he run.

*Harper*, in reply. The principle contended for by the captors is *stricti juris*, and extreme in its application to this particular case, where there is nothing like moral guilt in the conduct of the master, who did not intend to interfere in our distinct war. There is no adjudged case that comes up to this; and freight is refused from analogy to the general principle established by the British prize courts as to neutral interposition in the war. But an interference in the coasting and colonial, or other privileged trade of the enemy, and relief to him, is a *direct* assistance, and the rule cannot justly be extended to a remote and consequential aid not contemplated by the party. The license cases determined by this court, went on the ground of an adoption of the enemy character, and an incorporation with enemy interests; the case of the *Liverpool Packet*, determined by the same learned judge who tried this cause, shows the distinc-

tion between this and the license cases.[c]   The rule
of the war of 1756, even supposing it to be well
established, does not apply to the relative situation
of Great Britain and the United States.   The former
had hung out no signals of depression and defeat in
the peninsular war, and required no neutral aid as a
relief from the pressure of her enemies.[d]

1816.<br>The<br>Commercen.

STORY, J., delivered the opinion of the court.          March 21st.
The single point now in controversy in this cause
is, whether the ship is entitled to the freight for the
voyage.   The general rule that the neutral carrier
of enemy's property is entitled to his freight, is now
too firmly established to admit of discussion.   But
to this rule there are many exceptions.   If the neu-
tral be guilty of fraudulent or unneutral conduct, or
has interposed himself to assist the enemy in carry-
ing on the war, he is justly deemed to have forfeited
his title to freight.   Hence, the carrying of contra-
band goods to the enemy; the engaging in the coast-
ing or colonial trade of the enemy; the spoliation of
papers, and the fraudulent suppression of enemy in-
terests, have been held to affect the neutral with the
forfeiture of freight, and in cases of a more flagrant
character, such as carrying despatches or hostile
military passengers, an engagement in the transport
service of the enemy, and a breach of blockade, the
penalty of confiscation of the vessel has also been in-
flicted.[e]   By the modern law of nations, provisions

---

c 1 *Gallison*, 513.          1 *Rob.* 237.   The Sarah Christi-
d Vide APPENDIX, note III.   na.   *Ib.* 288.   The Haase.   *Ib.*
e *Bynk: Quæst. J. Pub.* c. 14.   296.   The Emanuel.   2 *Rob.* 101.

1816.

The
Commercen

are not, in general, deemed contraband; but they may become so, although the property of a neutral, on account of the particular situation of the war, or on account of their destination.[f]  If destined for the ordinary use of life in the enemy's country they, are not, in general, contraband; but it is otherwise if destined for military use.   Hence, if destined for the army or navy of the enemy, or for his ports of naval or military equipment, they are deemed contraband.[g]  Another exception from being treated as contraband is, where the provisions are the growth of the neutral exporting country.   But if they be the growth of the enemy's country, and more especially if the property of his subjects, and destined for enemy's use, there does not seem any good reason for the exemption; for, as Sir William Scott has observed, in such case the party has not only gone out of his way for the supply of the enemy, but he has assisted him by taking off his surplus commodities.[h]  But it is argued that the doctrine of contraband cannot apply to the present case, because the destination was to a neutral country; and it is certainly true that goods destined for the use of a neutral country can never be deemed contraband, whatever may be their character, or however well adapted to warlike purposes.   But if such goods are destined for the direct

---

The Immanuel.  *Ib.* 299. The Atlas.  *Ib.* 104. The Rising Sun. 4 *Rob.* 169.  The Maddona del Burso.  3 *Rob.* 295. The Neutralitat.  2 *Rob.* 128.  The Wol-

vart.  6 *Rob.* 420.  The Friendship.

*f* 1 *Rob.* 189. The Jonge Margaretha.

*g* *Ibid.*

*h* *Ibid.*

and avowed use of the enemy's army or navy, we should be glad to see an authority which countenances this exemption from forfeiture, even though the property of a neutral. Suppose, in time of war, a British fleet were lying in a neutral port, would it be lawful for a neutral to carry provisions or munitions of war thither, avowedly for the exclusive supply of such fleet? Would it not be a direct interposition in the war, and an essential aid to the enemy in his hostile preparations? In such a case the goods, even if belonging to a neutral, would have had the taint of contraband in its most offensive character, on account of their destination; and the mere interposition of a neutral port would not protect them from forfeiture.[i] Strictly speaking, however,

1816.

The Commercen.

[i] Articles which are exclusively useful for warlike purposes, are always contraband, when destined for the enemy; those of promiscuous use, in war and in peace, only become so under particular circumstances. *Grotius, de J. B. ac P.* l. 3. c. 1. s. 5. *Vattel*, l. 3. c. 7. s. 112. Among the latter class are included naval stores and provisions: though *Vattel* considers naval stores as always contraband, whilst he holds that provisions only become so under peculiar circumstances. "Les choses qui sont d'un usage particulier pour la guerre, et dont on empêche le transport chez l'ennemi s'appellent marchandises de contrabande. Telles sont les armes, les munitions de guerre, les bois, et tout ce qui sert à la construction, et à l'armémont des vaisseaux de guerre, les chevaux, & *les vivres mêmes en certaines occasions, ou l'on espere de réduire l'ennemi par la faim.*" But *Bynkershoek* reasons against admitting into the list of contraband, articles of promiscuous use, and the materials out of which warlike articles are formed. 2 *J. Pub.* l. 1. c. 10. He, however, states that materials for building ships may be prohibited under certain circumstances. "Quandoque tamen accidit, ut et navium materia prohibeatur, si hostis ea quam maxime indigeat, et absque ea commode bellum gerere haud possit. Quum Ordines Generales in s. 2., edicti contra Lysitanos

1816.

The
Commercen.

this is not a question of contraband; for that can arise only when the property belongs to a neutral,

Dec. 31, 1657, iis, quae communi populorum usu *contrabanda* censentur. Lysitanos juvari vetuissent, specialiter addunt in s. 3. ejusdem edicti, quia nihil nisi mari a Lysitanos metuebant, ne quis etiam navium materiam iis advehere vellet, palam sic navium à *contrabandis* distincta, sed ob specialem rationem addita. Ob eandem causam navium materia conjungitur cum instrumentis belli in s. 2. d. Edicti. contra Anglos Dec. 5. 1652, et in Edicto Ordinum Generalium contra Francos 9. Mart. 1689. Sed sunt hae exceptiones, quae regulam confirmant." So also of provisions, they are not, in general, contraband; but if the produce of an enemy's country, and not destined for the ordinary sustenance of human life, but for military or naval use, they become contraband, according to the law of England. And articles, the growth of the neutral exporting country, are not contraband, though carried in the vessels of another country. 4 *Rob.* 161. The Appollo. And the benefit of the principle is extended to maritime countries exporting the produce of neighbouring interior districts, whose produce those countries are usually employed in exporting, in the ordinary course of their trade. *Ib.* 354.

The Evert. But the law of France and Spain does not consider provisions as contraband. *Ordonnance de la Marine*, 1. 3. tit. 9. *des Prises*, art. 11. *D'Habreu sobre las Presas*, part 1. c. 10., p. 136. And Valin states that, both by the law of France and the common law of nations, provisions are contraband only where destined to besieged or blockaded places. But he asserts that naval stores were contraband at the time he wrote, (1758,) and had been so since the beginning of that century, which they were not formerly. *Sur l' Ord. Ib.* Pothier, commenting on the same article of the ordinance, observes, " A *l'égard* des munitions de bouche que des sujets des puissances neutres envoient à nos ennemies, elles ne sont point censées de contrabande, ni par conséquent sujettes c onfiseation; sauf dans un seul cas, qui est lorsqu'elles sont envoyées à une place assiégée ou bloquée." *De Propriété*, no. 104. By the Swedish Ordinance of 1715, contraband articles are declared to be those " qui peuvent être employées pour la guerre." The Danish Ordinance of 1659 (provided for the subsisting war with Sweden) contains a long list of contraband articles, among which are included naval stores and pro-

and here the property belonged to an enemy, and, therefore, was liable, at all events, to condemnation. But was the *voyage* lawful, and such as a neutral could, with good faith, and without a forfeiture, engage in? It has been solemnly adjudged that being engaged in the transport service, or in the conveyance of military persons in his employ, are acts of hostility which subject the property to confiscation.[k] And the carrying of despatches from the colony to the mother country of the enemy has subjected the party to the like penalty.[l] And in these cases, the fact that the voyage was to a neutral port was not thought to change the character of the transaction. The principle of these determinations was asserted to be that the party must be deemed to place himself in the service of the hostile state, and

visions. The modern conventional law of nations has generally excluded provisions and naval stores from the list of contraband, and in all the treaties made by the United States since they were an independent power, except in the treaties with Great Britain, they are excluded; but the only treaty now subsisting which contains a definition of contraband, is that of 1795 with Spain, which embraces the munitions of war only. The treaty of 1794 with Great Britain, declares naval stores, with the exception of unwrought iron and fir planks, to be contraband, and liable to confiscation, and declares that when provisions and other articles, not generally contraband, shall become such according to the existing law of nations, they shall be entitled to pre-emption, with freight to the carrier. By the treaty negotiated in 1807, but not ratified, provisions were omitted in the list of contraband, and tar, and pitch (unless destined to a port of naval equipment) were added to the naval stores excepted in the treaty of 1794.

[k] 4 *Rob.* 256. The Carolina. 6 *Rob.* 420. The Friendship. *Ib.* 430. The Orozembo.

[l] 6 *Rob.* 440. The Atalanta. *Ib.* 461. The Constantia. Note.

assist in warding off the pressure of the war, or in favouring its offensive projects. Now, we cannot distinguish these cases, in principle, from that before the court. Here is a cargo of provisions exported from the enemy's country, with the avowed purpose of supplying the army of the enemy. Without this destination they would not have been permitted to be exported at all. Can a more important or essential service be performed in favour of the enemy? In what does it differ from the case of a transport in his service? The property, nominally, belongs to individuals, and is freighted, apparently, on private account, but, in reality, for public use, and under a public contract implied from the very permission of exportation. It is vain to contend that the direct effect of the voyage was not to aid the British hostilities against the United States. It might enable the enemy, indirectly, to operate with more vigour and promptitude against us, and increase his disposable force. But it is not the effect of the particular transaction that the law regards, it is the general tendency of such transactions to assist the military operations of the enemy, and the temptations which it presents to deviate from a strict neutrality. Nor do we perceive how the destination, to a neutral port, can vary the application of this rule; it is only doing that indirectly which is prohibited in direct courses. Would it be contended that a neutral might lawfully transport provisions for the British fleet and army while it lay at Bordeaux preparing for an expedition to the United States? Would it be contended that he might lawfully supply a British

1816.

The
Commercen.

fleet stationed on our coast? We presume that two opinions could not be entertained on such questions; and yet, though the cases put are strong, we do not know that the assistance is more material than might be supplied under cover of a neutral destination like the present.

An attempt has been made to distinguish this case from the ordinary cases of employment in the transport service of the enemy, upon the ground that the war of Great Britain against France was a war distinct from that against the United States; and that Swedish subjects had a perfect right to assist the British arms in respect to the former; though not to the latter. Whatever might be the right of the Swedish sovereign, acting under his own authority, we are of opinion that if a Swedish vessel be engaged in the actual service of Great Britain, or in carrying stores for the exclusive use of the British armies, she must, to all intents and purposes, be deemed a British transport. It is perfectly immaterial in what particular enterprise those armies might, at the time, be engaged; for the same important benefits are conferred upon an enemy, who thereby acquires a greater disposable force to bring into action against us. In the Friendship, (6 *Rob.* 420. 426,,) Sir W. Scott, speaking on this subject, declares, " It signifies nothing whether the men, so conveyed, are to be put into action, on an immediate expedition, or not. The mere shifting of draughts in detachments, and *the conveyance of stores* from one place to another, is an ordinary employment of a transport vessel, and it is a distinction totally unimportant

whether this or that case may be connected with the *immediate active* service of the enemy. In removing forces from distant settlements, there may be no intention of immediate action; but still the general importance of having troops conveyed to places where it is convenient that they should be collected, either for present or future use, is what constitutes the object and employment of transport vessels." It is obvious that the learned judge did not deem it material to what places the stores might be destined; and it must be equally immaterial what is the immediate occupation of the enemy's military force. That force is always hostile to us, be it where it may be. To-day it may act against France, to-morrow, against us; and the better its commissary department is supplied, the more life and activity is communicated to all its motions. It is not, therefore, in our view, material whether there be another distinct war in which our enemy is engaged, or not: it is sufficient that his armies are everywhere our enemies, and every assistance offered to them must, directly, or indirectly, operate to our injury.

On the whole, the court are of opinion that the voyage, in which this vessel was engaged, was illicit, and inconsistent with the duties of neutrality, and that it is a very lenient administration of justice to confine the penalty to a mere denial of freight.[m]

---

[m] As to the penalty for the carrying of contraband, see 3 *Rob.* 182, note (*a.*) Freight and expenses are almost always refused by the British prize courts to a carrier of contraband. There is but one case in the books of an exception to this rule, which was of sail cloth carried to Amsterdam, the contraband being in a

MARSHALL, Ch. J.  As a principle, which I think
new, and which may certainly, in future, be very
interesting to the United States, has been decided in
this case, I trust I may be excused for stating the rea-
sons which have prevented my concurring in the
opinion that has been delivered.

1816.

The
Commercen.

In argument this sentence of the circuit court has
been sustained on two grounds; 1st. That the ex-

small quantity amongst a variety of other article. 3 *Rob.* 91. The Neptunus. The penalty is carri-ed beyond the refusal of freight and expenses, and is extended to the confiscation of the ship, and innocent parts of the same cargo, 1st. Where the ship and the con-traband articles belong to the same person. 1 *Rob.* 31. The Staadt Emden. *Ib.* 330. The Young Tobias. 2d. Where the cargo is carried with a false des-tination, false papers, or other circumstances of fraud. 3 *Rob.* 217. The Franklin. 4 *Rob.* 69. The Edward. 5 *Rob.* 290. The Richmond. 6 *Rob.* 125. The Ranger. 3d. Where the owner of the ship is bound, by the obli-gation of treaties between his own country and the capturing power, to refrain from carrying contra-band to the enemy. 3 *Rob.* 295. The Neutralitet. By the ancient prize law of France, contraband goods were subject to pre-emption only. *Ordonnance de* 1584., art. 69. The ordinance of 1681, sub-

jected the contraband articles on-ly to confiscation: but by the re-gulation of 1778, the same penal-ty was extended to the ship, in case three fourths of the cargo consisted of contraband articles. The law of Holland confiscates the contraband articles only, but refuses freight; the principle of which is vindicated by *Bynker-shoek.* "Idque longe verissimum est, nam mercedes non debentur, nisi itinere perfecto, et, ne per-ficeretur, hostis jure prohibuit. Deinde publicantur *contrabanda* velex delicto, et ita nihil commi-serunt navarchi, quam ipsi mer-cium vetitarum domini, vel, quod magis est, ex re, ex ipsa nimirum transvectione: quamois enim ami-co nostro non possimus commer-cio interdicere cum hoste nostro, possumus tamen prohibere, ne in bello illi prosit in necem nostram. Atque ita, quod publicatur, pub-licabitur citra ullum ullius homi-nis respectum, et habebitur, ac si divina periisset; extincto sic jure pignoris."

portation of grain from Ireland is generally prohibit-ed, and, therefore, that a neutral cannot lawfully engage in it during war.   2d. That the carriage of supplies to the army of the enemy is to take part with him in the war, and, consequently, to become the enemy of the United States so far as to forfeit the right to freight.

The first point has been maintained, on its suppo-sed analogies to certain principles which have been, at different times, avowed by the great maritime and belligerant powers of Europe respecting the colonial and coasting trade, and which are generally known in England, and in this country, by the appellation of the rule of 1756.   Without professing to give any opinion on the correctness of those principles, it is sufficient to observe that they do not appear to me to apply to this case.   The rule of 1756 prohibits a neutral from engaging in time of war in a trade in which he was prevented from participating in time of peace, because that trade was, by law, exclusive-ly reserved for the vessels of the hostile state. This prohibition stands upon two grounds.   1st. That a trade, such as the coasting or colonial trade, which, by the permanent policy of a nation, is re-served for its own vessels, if opened to neutrals dur-ing war, must be opened under the pressure of the arms of the enemy, and in order to obtain relief from that pressure.   The neutral who interposes to re-lieve the belligerant under such circumstances, res-cues him from the condition to which the arms of his enemy has reduced him, restores to him those re-sources which have been wrested from him by the

arms of his adversary, and deprives that adversary of the advantages which successful war has given him. This the opposing belligerent pronounces a departure from neutrality, and an interference in the war to his prejudice, which he will not tolerate. 2d. If the trade be not opened by law, that a neutral employed in a trade. thus reserved by the enemy, to his own vessels, identifies himself with that enemy, and by performing functions exclusively appertaining to the enemy character, assumes that character. Neither the one nor the other of these reasons applies to the case under consideration. The trade was not a trade confined to British vessels during peace, and opened to neutrals during war under the pressure created by the arms of the enemy. It was prohibited for political reasons, entirely unconnected with the interests of navigation, and thrown open from motives equally unconnected with maritime strength. Neither did the neutral employed in it engage in a trade then, or at any time, reserved for British vessels, and, therefore, did not identify himself with them. He was not performing functions exclusively appertaining to the enemy, and, consequently, in performing them did not assume that character.

The second point presents a question of much more difficulty. That a neutral carrying supplies to the army of the enemy does, under the mildest interpretation of international law, expose himself to the loss of freight, is a proposition too well settled to be controverted. That it is a general rule, admitting of few. if any, exceptions. is not denied by the coun-

1816.

The Commerce.

sel for the appellants. But they contend that this case is withdrawn from that rule by its peculiar circumstances. The late war between the United States and Great Britain was declared at a time when all Europe, including our enemy, was engaged in a war with which ours had no connexion, and in which we professed to take no interest. The allies of our enemy, engaged with him in a common war, the most tremendous and the most vitally interesting to the parties that has ever desolated the earth, were our friends. We kept up with them the mutual interchange of good offices, and declared our determination to stand aloof from that cause which was common to them and Great Britain. They, too, considered this war as entirely distinct from that in which they were engaged. Although at a most critical period we had attacked their ally, they did not view it as an act of hostility to them. They did not ascribe it to a wish to affect, in any manner, the war in Europe, but solely to the desire of asserting our violated rights. They seemed almost to consider the Britain who was our enemy, as a different nation from that Britain who was their ally.

How long this extraordinary state of things might have continued it is impossible to say; but it certainly existed when the Commercen was captured. What its effect on that capture ought to be, must depend more on principle than on precedent. It has been said, and truly said, by the counsel for the captors, that we were at war with Great Britain in every part of the world. We were enemies everywhere. Her troops in Spain, or elsewhere, as

well as her troops in America, were our enemies. It was a conflict of nation against nation. This is conceded; and, therefore, the cargo of the Commercen, being British property, was condemned as prize of war. But, although this must be conceded, the corollary which is drawn from it, that those who furnish their armies in Spain with provisions, aid them to our prejudice, and, therefore, take part in the war, and are guilty of unneutral conduct, must be examined before it can be admitted. It is not true that every species of aid given to an enemy is an act of hostility which will justify our treating him who gives it, or his vessels, as hostile to us. The history of all Europe, and especially of Switzerland, furnishes many examples of the truth of this proposition. Those examples need not be quoted particularly, because they stand on principles not entirely applicable to this case. It is the peculiarity of this war which requires the adoption of rules peculiar to a new state of things, in adopting which we must examine the principle on which a nation is justified in treating a neutral as an enemy. That a neutral is friendly to our enemy, and continues to interchange good offices with him, can furnish no subject of complaint; for, then, all commerce with one belligerent would be deemed hostile by the other. The effect of commerce is to augment his resources, and enable him the longer to prosecute the war; but this augmentation is produced by an act entirely innocent on the part of the neutral, and manifesting no hostility to the opposing belligerent. It cannot, therefore, be molested by him while the same good offices

are allowed to him, although he may not be enabled to avail himself of them to an equal degree. It would seem, then, that a remote and consequential effect of an act is not sufficient to give it a hostile character; its tendency to aid the enemy in the war must be direct and immediate. It is also necessary that it should be injurious to us; for a mere benefit to another, which is not injurious to us, cannot convert a friend into an enemy.

If these principles be correct, and they are believed to be so, let us apply them to the present case. When hostilities commenced between the United States and Great Britain, that country was carrying on a war with France, in which the great powers of Europe were combined. We did not expect, and certainly had no right to expect, that our declaration of war against one of the allies would, in any manner, affect the operations of their common war in Europe. The armies of Portugal and Spain were united to those of Britain, and unquestionably aided and assisted our enemy, but they did not aid and assist him against us, and, therefore, did not become our enemies. Had any other of the combined powers equipped a military expedition for the purpose of reinforcing the armies of Britain in any part of Europe, or had a new ally engaged in the war, that would have been no act of hostility against the United States, although it would have aided our enemy. But if a military expedition to the United States had been undertaken, the case would have assumed a different aspect. Such expedition would be hostile to this country, and the power undertaking it would

become our enemy.· It would have been an interfe- 1816.
rence operating directly to our prejudice.  The de-  The
claration of war against Great Britain had, without Commercen.
doubt, a remote and consequential effect on the war
in Europe.  The force employed against the United
States must be subducted from that employed in sup-
port of the common cause in Europe, or greater ex-
ertions must be made which might sooner exhaust
those resources which enabled her to continue her
gigantic efforts in their common war.  Consequently,
the declaration of war by the United States remotely
affected the war in Europe, to the advantage of one
party and the injury of the other.  Yet no one of the
allies considered this declaration as taking part in
that war, and placing America in the condition of an
enemy.  But, had the United States employed their
force on the peninsula against the British troops, or
had they interfered in the operations of the common
war, it may well be doubted whether they might not
have been rightfully considered as taking part against
the allies, and arranging themselves on the side of
the common enemy.

In answer to arguments of this tendency, made at
the bar, it was said that nations are governed by po-
litical considerations, and may choose rather to over-
look conduct at which they might justly take
offence, than unnecessarily to increase the number
of their enemies, or provoke increased hostility;
but that courts of justice are bound by the law,
and must inflexibly adhere to its mandate.  While
this is conceded, it is deemed equally true that
those acts which will justify the condemnation of a

neutral as an enemy, would also justify the treating his nation as an enemy, if they were performed or defended by the nation. There is a tacit compact that the hostile act of the individual shall not be ascribed to his government; and that in turn, the government will not protect the individual from being treated as an enemy. But if the government adopts the act of the individual, and supports it by force, the government itself may be rightfully treated as hostile. Thus contraband of war, though belonging to a neutral, is condemned as the property of an enemy, and his government takes no offence at it; but should his government adopt the act, and insist upon the right to carry articles deemed contraband, and support that right, it would furnish just ground of war. The belligerant might choose to overlook this hostile act, but the act would be, in its nature, hostile. The inquiry, then, whether the act in which this individual Swede was employed, would, if performed by his government, have been considered an act of hostility to the United States, and might rightfully be so considered, is material to the decision of the question, whether the act of the individual is to be treated as hostile. Great Britain and Sweden were allies in the war against France. Consequently, the king of Sweden might have ordered his troops to co-operate with those of Britain, in any place, against the common enemy. He might have ordered a reinforcement to the British army on the peninsula, and this reinforcement might have been transported by sea. An attempt on the part of the United States to intercept it, because it was

aiding their enemy, would certainly have been an interference in the war in Europe which would have provoked, and would have justified, the resentment of all the allied powers. It would have been an interference not to be justified by our war with Britain, because those troops were not to be employed against us. If, instead of a reinforcement of men, a supply of provisions were to be furnished in that part of the allied army which was British, would that alter the case? Could an American squadron intercept a convoy of provisions, or of military stores, of any description, going to an army engaged in a war common to Great Britain and Sweden, and not against the United States? Could this be done without interfering in that war, and taking part in it against all the allies. If it could not, then any supplies furnished by the government of Sweden, promoting the operations of their common war, whether intended for the British or any other division of the allied armies, had a right to pass unmolested by American cruisers. It is not believed that any act which, if performed by the government, would not be deemed an act of hostility, is to be so deemed if performed by an individual. Had the provisions then on board the Commercen been Swedish property, the result of this reasoning is that it would not have been confiscated as prize of war. Being British property, it is confiscable; but the Swede is guilty of no other offence than carrying enemy's property, an offence not enhanced in this particular case by the character of that property. He is, therefore, as much entitled to freight as if his cargo had been

1816.

The
Commercen.

of a different description. His trade was not more illicit than the carriage of enemy's goods for common use would have been.

If the cases in which neutrals have been condemned for having on board articles, the transportation of which clothe them with the enemy character, be attentively considered, it is believed that they will not be found to contravene the reasoning which has been urged. To carry despatches to the government has been considered as an act of such complete hostility, as to communicate the hostile character to the vessel carrying them. But this decision was made in a case where the despatches could only relate to the war between the government of the captors, and that to which the despatches were addressed. They were communications between a colonial government, in danger of being attacked, and the mother country. In a subsequent case, it was determined that a neutral vessel might bear despatches to a hostile government without assuming the belligerant character, if they were from an ambassador residing in the neutral state. Yet such despatches might contain intelligence material to the war. But this is a case in which the belligerant right to intercept all communications addressed to the enemy, by the officers of that enemy, is modified and restrained by the neutral right to protect the diplomatic communications which are necessary to the political intercourse between belligerants and neutrals. It is a case in which the right of the belligerant is narrowed and controlled by the positive rights of a neutral; still more reasonably may they

be narrowed and controlled by the positive rights of a belligerant engaged in a war in which we have no concern, and in which we ought not to interfere. To transport troops, or military persons, belonging to the enemy, from one place to another, has, also, been determined to subject the vessel to condemnation; but, in those cases, the service in which it was supposed the persons, so conveyed, were to be employed, was against the government of the captors. The transportation of these persons was to aid the views of one belligerant against the other, and was, therefore, to take part in the war against that other. It is an act, the operation of which is direct and immediate.

It may be said that this reasoning would go to the protection of British troops passing to the peninsula, and of British supplies transported in British vessels for their use; that it therefore proves too much, and must, consequently, be unsound.

It is admitted that, pressed to its extreme point, the argument would go this extent, an extent which cannot be maintained; but it does not follow that it is unsound in every stage of its progress. In every case of conflicting rights, each must yield something to the other. The pretensions of neither party can be carried to the extreme. They meet—they check—they limit each other. The precise line which neither can pass, but to which each may advance, is not easily to be found and marked; yet such a line must exist, whatever may be the difficulty of discerning it. To attack an enemy, or to take his property, if either can be done without violating the sove-

1816.

The Commercen.

reignty of a friend, is of the very essence of war. None can be offended at the exercise of this right, who may not be offended at the declaration of war itself. The injury which the allies of our enemy, in a war common to them, (but in which we are not engaged,) sustain, by this occasional interruption, is incidental, while, on our part, it is the exercise of a direct and essential right. But when we attack a friend who is carrying on military operations conjointly with our enemy, but not against us, we are not making direct war, but are using those *incidental* rights which war gives us, against those *direct* rights which are exercised by a belligerant not our enemy, and which constitute war itself. In either case it would seem to me that the incidental must yield to the direct and essential right.

Upon this view of the subject, I have at length, not, it is confessed, without difficulty, come to the conclusion, that the Commercen, being a Swedish vessel, whose nation was engaged in a war, common to Great Britain and Sweden, against France, and to which the United States were not a party, might convey military stores for the use of the British armies engaged in that war, as innocently as she could carry British property of any other description, and is, therefore, as much entitled to freight as she would be had the property belonged to the enemy, but been destined for ordinary use.

LIVINGSTON, J.   I concur in the opinion of the Chief Justice. Considering Sweden an ally of Great Britain, in the war which the latter was carrying on

in the peninsula, either the king of Sweden himself
might send transports with provisions for the use of
the British army, while engaged in any common en-
terprise, or his subjects might lawfully aid in such
transportation, without a violation of their neutral
character as it regarded the United States.    If
the American government had asserted the right of
capturing and condemning Swedish vessels, or de-
priving them of their freight, on the ground on
which it has been denied to the Commercen, I am
not certain that Sweden would not have thought it
a very serious aggression, and would not have had a
right to consider it, if persisted in, as an act of hos-
tility.

JOHNSON, J.  I also concur in the opinion of the
Chief Justice ; and I do it without the least doubt or
hesitation.  Sweden was an ally in the war going on
in the peninsula, and her subjects had an indubitable
right to transport provisions in aid of their nation, or
its allies.  The owner, therefore, had a right to his
freight ; for he did no act inconsistent with our belli-
gerant rights, while in the direct and ordinary exer-
cise of those rights which a state of war conferred
on himself.

Sentence of the circuit court affirmed.