The CHIEF JUSTICE delivered the opinion of the court.
This case is of much interest. It was very thoroughly argued, and has been attentively considered.
The Peterhoff was ca.ptured near the island of St. Thomas, in the West Indies, on the 25th of February, 1863, by the United States Steamship Vanderbilt. She was fully documented as a British merchant steamer, bound from London to Matamoras, in Mexico, but was seized, without question of her neutral nationality, jipou suspicion that her real destination was to the. blockaded coast of-the States in rebellion, and that her cargo consisted, in part, of contraband goods.
The evidence in the record satisfies us that the voyage of the Peterhoff was not simulated. She was in the proper course of a voyage from London to. Matamoras. Iler manifest, shipping list, clearance, and other custom-house papers, all show an intended voyage from the one port to the other. And the preparatory testimony fully corroborates 'the documentary evidence.
Nor have we been able to find anything in the record which fairly warrants a belief that the cargo had any other direct destination. All the bills of lading show shipments to be delivered off the mouth of the Rio Grande, into lighters, for Matamoras. And this was in the usual course of trade. Matamoras lies on the Rio Grande forty miles above its mouth; and the Peterhoff’s draught of water would not allow her to enter the river. She could complete her voyage, therefore,' in no other way than by the delivery of her cargo into lighters for conveyance to the port of destination. It is true that, by these lighters, some of the cargo might be conveyed directly.to the blockaded coast; but there is no ovidetice which Warrants us in saying that such conveyance was intended by the master or the shippers.
We dismiss, therefore, from consideration, the claim, suggested rather than urged in behalf of the government, that *50 the ship and cargo, both or either, were destined for the blockaded coast.
But it was maintained in argument (1) that trade with Matamoras, at the time of the capture, was made unlawful by the blockade of the mouth of the Rio Grande; and if not, then (2) that the ulterior destination of the cargo was Texas and the other States in rebellion, and that this ulterior destination was in breach of the blockade.
We agree that, so far as liability for infringement of blockade is concerned, ship and cargo must share the same fate. The owners of the former were owners also of part of the latter; the adventure was common; the destination of the cargo, ulterior as well as direct, was known to the owners of the ship, and the voyage was undertaken to promote the objects of the shippers. There is nothing in this ease as in that of the Springbok to distinguish between the liability of-the ship and that of the merchandise it conveyed.
We proceed to inquire, therefore, whether the mouth of the Rio Grande was, in fact, included in the blockade of the rebel coast?
It must be premised that no paper or constructive blockade is allowed by international law. When such blockades have been attempted by other nations, the United States have ever protested against them and denied their validity. Their illegality is now confessed on all hands. It was solemnly proclaimed in the Declaration of Paris of 1856, tG which most of the civilized nations of the wprLd have since adhered; and this principle is nowhere more fully recognized than in our own country, though not a party to that declaration.
What then was the blockade of the rebel States? The President’s proclamation .of the 19th April, 1862, declared the intention of the government “ to set on foot a blockade of the ports” of those States, “by posting a competent force so as to prevent the entrance or exit of vessels.”* And, in explanation of this proclamation, foreign .governments were *51 informed “ that it was intended to blockade the whole coast from the Chesapeake Bay to the Rio Grande.”*
In determining the question whether this blockade was intendbd to include the mouth of the Rio Grande, the treaty with Mexico,† in relation to that river, must be considered. It was stipulated in the 6th article that the boundary line between the United States and Mexico should commence in the Gulf, three leagues from land opposite the mouth of the Rio Grande, and run northward with the middle of the river. And‘in the 7th article it was further stipulated that the navigation of the river should be free and common to the citizens of both countries without interruption by either without the consent of the-other, even for the purpose of improving the navigation.
The' mouth of the Rio Grande was, therefore, for half its width, within Mexican territory, and, for the purposes of navigation, was, altogether, as much Mexican'as American. It is clear, therefore, that nothing short of an express declaration by the Executive would warrant us in ascribing to the government an intention to blockade such a river in time of peace between the two Republics.
It is supposed that such a declaration is contained in the President’s proclamation of February 18th, 1864,‡ which recites as matter of fact that the port of Brownsville had been blockaded, and declares the relaxation of the blockade. The argument is that Brownsville is situated on the Texan bank of the Rio Grande, opposite Matamoras; and that the recital in the proclamation that Brownsville had been blockaded must therefore be regarded as equivalent to an assertion that the .mouth of the river was included in the blockade of the coast. It would be difficult to avoid this inference if Brownsville could only be blockaded by the blockade of the river. ■ But that town may be blockaded also by the blockade of the harbor of Brazos Santiago and the Boca Chica, which were, without question, included in the-block *52 ade of the coast. Indeed, until within a year prior to the proclamation, the port of eutry for the district was not Brownsville, but Point Isabel on that harbor.; and, in the usual course, merchandise intended for Brownsville was entered at Point Isabel, and taken by a short land conveyance to its destination.
We know of no judicial precedent for extending a blockade by construction. But there are precedents of great authority the other way. "We will cite one.
The Frau Usabe* and her cargo were captured in 1799 for breach of the British blockade of Holland. The voyage was from Hamburg to Antwerp, and, of course, in its latter part,, up the Scheldt. Condemnation of the cargo'was asked on the ground that the Scheldt was blockaded by the blockade of Holland. But Sir W". Scott said, “ Antwerp is certainly no part of Blolland, and, with respect to the Scheldt,, it is not within the Hutch "territory, but rather a coterminous river, dividing Holland from the adjacent, country.” This case is the more remarkable- inasmuch as Antwerp is on the right bank, of the river, as is also the whole territory of Holland; and, though no part of that country was part of Flanders, then equally with Holland combined with France in a war with Great Britain. “ It was just as lawful,” as Sir W". Scott observed, “to blockade the port of Flanders as those of Holland,”'and the Scheldt might have been included in the blockade, but he would not hold it necessarily included in the absence of an express declaration.
"This cáse seems to be in point.
It is impossible to say, thei-efore, in the absence of an express declaration to that effect, that it was the intention of the government to blockade the mouth of the Rio Grande. And we are the less inclined to say it, because we are not aware of any instance in which a belligerent, has attempted to blockade the mouth of a river or harbor occupied on one side by neutrals, or in which such a blockade has been recognized as valid by any court administering the law of nations.
*53 The only case which lends even apparent countenance to such a doctrine, is-that of The Maria* adjudged by Sir W. Scott in 1805. • The cargo in litigation had been conveyed from Bremen, through the Weser to Varel, near the mouth of the Jahde, and there transshipped for America. The mouth of the Weser was then blockaded, and Sir W. Scott held, that the commerce of Bremen, though neutral, could not be carried on through the Weser. This, he admitted, was a great inconvenience to the neutral city, which had no other outlet to the sea; but it was an incident of her situation and of war. It happened in that case that a relaxation of the blockade,in favor of Bremen warranted restitution. Otherwise there can be no doubt that the cargo would have been reluctantly condemned.
But it is an error to suppose this ease an authority for an American blockade of the Rio Grande, affecting the commerce of Matamofas. Counsel were mistaken in the supposition that only one bank of the Weser was occupied by the French, and that Bremen was on the other. Both banks were in fact so held, and the blockade was warranted by the hostile possession of both. The case would be in point had both banks of the Rio Grande been in rebel occupation.
Still less applicable to the present litigation is the case of The Zelden Musi, cited at the bar. That was not a case of violation of blockade at all.. It was a question of contraband, depending on destination. The Zelden Rust, a neutral vessel, entered the Bay or River De Betancos, on one side of which was Ferrol, and on the other Co'runna. Counsel argued on the supposition that Ferrol was a belligerent and Corunna a neutral port, whereas both were belligerent; and the cargo was condemned on the ground of actual or probable destination to Ferrol, which was a port of naval'equipment; though nominally destined to Corunna, also a port of naval equipment, though not to the same extent as Ferrol. There was no blockade of the bay or river or of either town.
It is unnecessary to examine other cases referred to by *54 counsel. It is sufficient to- say that none of them support 'the doctriuVs that a belligerent can blockade the mouth of a river, occupied on one bank by neutrals with complete rights of navigation. .
We have no hesitation, therefore, in holding that the mouth, of the Rio Grande was not included in the blockade of the ports of the rebel States, and that neutral commerce with Matamoras, except in contraband, was entirely free.
If we had- any doubt upon-the subject, it would be. removed by the fact that it was the known and constant practice of the government to grant clearances for Matamoras from New York, on condition'of giving bond that no supplies should • be furnished to the rebels — a condition necessarily municipal iii its nature and inapplicable to any clearance for a foreign- port. ' These clearances are incompatible with the existence of the supposed blockade.
We come next to the question whether an ulterior destination to the rebel region, which we now assume as proved, affected the cargo of the Peterhoff with liability to condemnation. We mean the. neutral cargo; reserving for the .present the question of contraband, and questions arising upon citizenship or nationality of shippers.-
It is an.undoubted general principle, recognized by this court in the case of The Bermuda, and in several other cases, that an ulterior destination to a blockaded port will infect the primary, voyage to a neutral port with liability for intended violation of blockade.
The question now is whether the same consequence will attend an ulterior destination to a belligerent country by inland conveyance. And upon "this question the- authorities seem quite clear.
During the blockade of Holland in 1799, goods belonging-to Prussian subjects were shipped from Edam, near Amsterdam, by inland navigation to Emden, in Hanover,, for transshipment to London. Prussia and Hanover were neutral. The goods were captured on the voyage from Emden, and the cause* came before the British Court of Admiralty in *55 1801. It was held that the blockade did not affect the trade of Holland carried on.with neutrals by means of inland navigation.- “ It was,” said Sir William Scott, “ a mere maritime blockade effected by force operating only at sea.” He admitted that such trade would defeat, partially at least, .the object of the blockade, namely, to cripple the trade of Holland, but observed, “ If that is the consequence, all that can be said is that it is an unavoidable consequence. It must be imputed to the nature of the thing which will not admit a remedy of this species. The court cannot on that ground take upon itself to say that a legal blockade exists where no actual blockade can be applied.....It must be presumed that this was foreseen by the blockading state, which, nevertheless, thought proper to impose it to the extent to which it was practicable.”
The same principle governed the decision in the case of The Ocean,* made also in 1801. At the time of her voyage Amsterdam was blockaded, but the blockade had not been extended to the other ports of Holland. Her cargo consisted partly or wholly of goods ordered by American merchants from Amsterdam, and sent thence by inland conveyance to Rotterdam, and there shipped to America. It was held that.the conveyance from Amsterdam to Rotterdam, being inland, was not affected by the blockade, and the goods, which had been captured, were restored.
These were cases of trade from a blockaded to a neutral country, by means of inland navigation, to a neutral port or a port not blockaded. The same principle was applied' to trade from a neutral to a blockaded country by inland conveyance from the neutral port of primary destination to the blockaded port of ulterior destination in the case of the Jonge Pieter,† adjudged in 1801. Goods belonging to neutrals going from London to Emdeu, with ulterior destination by land or an interior canal navigation to Amsterdam, were held not liable to seizure for violation of the blockade of that port. The particular goods in that instance were con *56 .demned upon evidence that they did not in fact belong tc neutrals,- but to British merchants, engaged in unlawful trade with the enemy; but the principle just stated was explicitly affirmed.
These cases fully recognize the lawfulness of neutral trade to or from a blockaded country by inland navigation or transportation. They assert principles without disregard of which it is impossible to hold that inland trade from Matamoras, in Mexico, to Brownsville or Galveston, in Texas, or from Brownsville or Galveston to Matamoras, was affected by the blockade of the Texan coast.
And the general doctrines of international law lead irresistibly to the same conclusion.. We know of but two exceptions to the rule of free trade by neutrals with belligerents : the first is that there must be no-violation of blockade or siege; and the second, that there must be no conveyance' of contraband to either belligerent. And' the question we are now considering is, “Was the cargo-of the Peterhoff within the first of these exceptions ?” We have seen that Matamoras was not and could not be blockaded; and it is manifest that there was not and could not be any blockade of the Texan bank of the Bio Grande as against the trade of Matamoras. No blockading vessel was in the river; nor could any such vessel ascend the river, unless supported by a competent military force on land.
The doctrine of The Bermuda case, supposed by counsel to have an important application to that before us, has, in reality, no application at all. There is an obvious and broad line of distinction between the cases. The Bermuda and her cargo were condemned because engaged in a voyage ostensibly for a neutral, but- in reality either directly or by substitution of another vessel, for a blockaded port. The Peterhoff was destined, for a neutral port .with no ulterior destination for the ship, or none by sea for the cargo to any blockaded place. In the case of the Bermuda, the cargo destined primarily for Nassau could not reach its ulterior destination without violating the blockade of the rebel ports; in the ca'se before, us the cargo, destined primarily for Matamoras, *57 could reach au ulterior destination in Texas without violating any blockade at all.
We must say, therefore, that trade, between London and' Matamoras, even with intent to supply, from Matamoras, goods to Texas, violated no blockade, and cannot be declared unlawful.
Trade with a neutral port in immediate proximity to the territory of one belligerent, is certainly very inconvenient to the other. Such trade, with unrestricted inland commerce between such a port and the enemy’s territory, impairs undoubtedly and very seriously impairs the value of a blockade of the enemy’s coast. But in cases such as that now in judgment, we administer the public law of nations, and are not at liberty to inquire what is for the particular advantage or disadvantage of our own or another country. We must follow the lights of reason and the lessons of the masters of international jurisprudence.
The remedy for inconveniences of the sort just mentioned is with the political department of the government. In the particular instance before us, the Texan bank of the Rio Grande might have been occupied by the national forces; or with the consent of Mexico, military possession might have been taken of Matamoras and the Mexican bank below. In either coui’se Texan trade might have been entirely cut off. Sufficient reasons, doubtless, prevailed against the adoption of either. The inconvenience of either, at the time, was doubtless supposed to outweigh any advantage that might be expected from the interruption of the trade.
What has been said sufficiently indicates our judgment that the ship and cargo are free from liability for violation of blockade.
We come then to other questions.
Thus far we have not thought it necessary to discuss the question of actual destination beyond Matamoras. Nor need we now say more upon that general question than that we think it a fair conclusion from the whole evidence that the eargo was to be disposed of in Mexico or Texas as might be found most convenient and profitable to the owners and *58 consignees, who were either at Matamoras or on board the ship. Destination in this case becomes specially important Only in connection with the question of contraband.
And this brings us to the question : Was any portion of the cargo of the Peterhoff contraband ?
The classification of goods as contraband or not contraband has much perplexed text writers and jurists. A strictly accurate and satisfactory classification is perhaps impracticable;-but that which is best supported by American and English decisions may be said to divide all merchandise into three classes. Of these classes, the first consists of articles manufactured and primarily and ordinarily used for military purposes in time of war; the second, of articles which may' be' and are used for purposes of war or peace, according to circumstances; and the third, of articles exclusively used for peaceful purposes.* Merchandise of the first class, destined to a, belligerent country or places occupied by the army or navy of a belligerent, is always contraband; merchandise of the second class is contraband only when actually destined to the military or naval use of a belligerent; while merchandise of the third class is not contraband at all, though liable to seizure and condemnation for violation of blockade or siege.
A considerable portion of the cargo .of the Petei’hoff was of the third class, and need not be further referred to. A large portion, perhaps, was of the second class, but is not proved, as we think, to have been actually destined to belligerent use, and cannot therefore be treated as contraband. Another portion was, in our judgment, of the first class, or? if of the second, destined directly to the rebel military ser-; vice. This portion of the cargo consisted of the cases of artillery harness, and of articles described in the invoices as “ men’s army bluchers,” “ artillery boots,” and “ government regulation gray blankets.” These goods come fairly under the description of goods primarily and ordinarily used *59 for military purposes in time of war. They make part of the necessary equipment of an army.
It is true that even these goods, if really intended for sale in the market of Matamoras, would be free of liability: for contraband may be transported by neutrals to a neutral port, if intended to make part of its general stock in trade. But there is nothing in the case which tends to convince us that such was their real destination, while all the circumstances indicate that these articles, at least, were destined for the use of the rebel forces then occupying Brownsville, and other places in the vicinity.
And contraband merchandise is subject to a different fule in respect to ulterior destination than that which applies to merchandise not contraband. The latter is liable to capture only when a-violation of blockade is intended; the former when destined to the hostile country, or to the actual military or naval use of the enemy, whether blockaded or not. The trade of neutrals with belligerents in articles not contraband is absolutely free unless interrupted by blockade; the conveyance by neutrals to belligerents of contraband articles is always unlawful, and such articles may always be seized during transit by sea. Hence, while articles, not contraband, might be sent to Matamoras and beyond to the rebel region, where the communications were not interrupted by blockade, articles of a contraband character, destined in fact to a State in rebellion, or for the use of the rebel military forces, were liable' to capture though primarily destined to Matamoras.
We are obliged to conclude that the portion of the cargo which we have characterized as contraband must be condemned.
And it is an established rule that the part of the cargo' belouging to the same owner as the contraband portion must share its fate. - This rule is well stated by Chancellor Kent, thus: “ Contraband articles are infectious, as it is called, and contaminate the whole cargo belonging to the same owners, and the invoice of any particular article is not usu ally admitted to exempt it from general confiscation.”
*60 So much of the cargo of the Peterhoff, therefore, as actually belonged to the owner of the artillery harness, and the other contraband goods, must be also condemned.
Two other questions remain to be disposed of.
The first of these relates to the political status of Redgate, one of the owners of the cargo. It was insisted, in the argument for the government, that this person was an enemy, and that the merchandise owned by him was liable to capture and confiscation as enemy’s property.
It appears that he was by birth an Englishman; that he became a citizen of the United States; that he resided in Texas at the outbreak of .the rebellion; made, his escape; became a resident of Matamoras; had been engaged in trade there, not wholly confined, probably, to Mexico; and tvas on his return from England with a large quantity of goods, only a small part of which, however, was his own property, with the intention of establishing a mercantile house in that place.
It has been held, by this court, that persons residing in the rebel States at .any time during the civil war must be considered as enemies, during such residence, without regard to their personal sentiments or dispositions.*
But this has never held in respect to persons faithful tc the Union, who have escaped from those States, and have subsequently resided in the loyal States, or in neutral countries. Such citizens of the United States lost no rights as citizens by reason of temporary and constrained residence in the rebellious portion of the country.
And to this class Redgate seems to have belonged. He cannot, therefore, be regarded as an enemy. If his property was liable to seizure at all on account of his political character, it was as property of a citizen of the United States, proceeding.to a State in insurrection. But we see no sufiicient ground for distinguishing that portion of the cargo owned by him, as to destination, from any other portion.
*61 The other question relates to costs and expenses.
Former!}7 conveyance of contraband subjected the ship to forfeiture; but in more modern times, that consequence, in ordinary cases, attaches only to the freight of the contraband merchandise. That consequence only attaches in the present case.
But the fact of such conveyance may be properly taken into consideration, with other circumstances, in determining the question-of costs and expenses.
It was the duty of the captain of the Peterhoff, when brought to by the Vanderbilt, to send his papers on board, if required. Pie refused to do so. The circumstances might well excite suspicion. The captain of a merchant steamer like the Peterhoff is not privileged from search by the fact that he has a government mail on board; on the contrary he is bound by that circumstance to strict performance of neutral duties andto special respect for belligerent rights.
The search led to the belief on the part of the officers of the Vanderbilt that there was contraband on board, destined to the enemy. ’ This belief, it is now apparent, was war-l’anted. It was therefore the duty of the captors to bring the Peterhoff in for adjudication, and clearly they are not liable for the costs and expenses of doing so.
On the other hand, not only was the captain in the wrong iu the refusal just mentioned, but .it appears that papers were destroyed on board his ship at the time of capture. Some.papers were burned by a passenger, named Mold, or by his directions. A package was also thrown overboard-by direction of'the captain. This package is variously described by the witnesses as a heavy sealed pabkage wrapped in loose paper; as a box of papers; - and as a packet of despatches sealed up in canvas and weighted with lead. By the captain it is represented as a package belonging to Mold, and containing a white powder. We are unable to credit this representation. It is highly improbable 1liat, under the circumstances described by the captain, he would have thrown any package overboard at such a time, and with the plain intent of- concealing it from the captors, if it contained *62 nothing likely, in his opinion, to prejudice the case of the ship and cargo.
We must say that his conduct' was inconsistent with the frankness and good faith to which neutrals, engaged in a commerce open to great suspicion, are most strongly bound. Considering the other facts in the case, however, and the almost certain destination of the ship to a neutral port, with a cargo, for the most part, neutral in character and destination, We shall not' extend the effect of this conduct of the captain .to condemnation, but we shall decree payment of costs and expenses by the ship as a condition of restitution.
Decree accordingly.

 12 Stat. at Large, 1259.

 9 Stat. at Large, 926.

 13 Stat. at Large, 740.

 4 Robinson, 63.

 6 Robinson, 201.

 The Stert, 4 Robinson, 65.

 The Stert, 3 Robinson, 297.

 4 Id. 79.

 Lawrence’s Wheaton, 772-6, note; The Commereen, 1 Wheaton, 382; Dana’s Wheaton, 629, note; Parsons’ Mar. Law, 93-4.

 Prize Cases, 2 Black, 666, 687-8; The Venice, 2 Wallace, 258; Mrs. Alexander’s Cotton, Id. 404.

Lawrence’s Wheaton, 829, n.