Davis, J.,
delivered the opinion of the court:
* The Joanna, a registered merchant vessel of the United States, sailed in August, 1798, from City Point, Va., laden with tobacco consigned to an Englishman residing in Bristol, England, who, the court find, owned the cargo. The Joanna, while *202 pursuing ber voyage to Bristol, was captured upon the high seas by a French privateer; she was taken into La Rochelle, and was there tried by the proper tribunal and condemned. The specific ground of condemnation seems to have been an insufficiency in the form of her crew list; but as she was fully documented — having on board her register, a sea-letter, a Mediterranean passport, a triplicate manifest, a clearance, and a shipping agreement between master and crew — the condemnation can not be sustained on that ground. The Joanna had on board, by the admission of the prize tribunal, papers sufficient to establish the fact that she was owned by citizens of the United States.' We have already decided that a condemnation based simply on the absence of a róle équip age or upon its informality was illegal (Cushing v. The United States, 23 C. Cls. R., 56), and ¡that “ in default of express treaty provision no government can prescribe to our merchantmen navigating the high seas the detailed form and number of the papers they are to carry, nor seize or confiscate those merchantmen for noncompliance with that nation’s municipal statutes.” (Gray v. The United States, 21 C. Cls. R., 401.)
There appears, however, another and very important fact in this case, and while the prize tribunal do not very clearly state that they rely upon it, the inference is not unfair that it materially influenced the result. The tribunal say, in substance, that while the Joanna had many ship’s papers, including a register and passport, she should not sail without having other documents prescribed by French laws, especially as she was loaded with merchandise of which the ownership was not designated by any papers, and which was destined to an enemy’s port. The French laws, of course, have no operation on board an American merchantman upon the high seas; she is there subject only to the municipal. iaw of the United States, to treaties, and to the law of nations. Therefore the ground of confiscation specifically alleged is without validity.
The cargo, however* was English; that is, as against France, it was enemy’s property found in a neutral bottom upon the high seas, and we have now to consider what were the rights of France under these circumstances. Before considering this subject we may say that we are of opinion that should a good reason for the condemnation of a vessel appear in the record before a prize court, although that reason may not have been *203 explicitly and specifically alleged by that tribunal as the reason for the result reached by them, we shall still uphold the decision of the tribunal. As we have already announced, we in these cases—
“Are to aid the political department of the Government, by its direction, in the disposal of contentions which arise from past international transactions. * * * The legislature have instructed us * * * to advise them not as to the law enforceable in courts of law, not as to abstract rights, but as to the law enforceable in their own higher jurisdiction.” (Cushing v. The United States, 22 C. Cls. R., 30.)
No political officer of the Government would seek, upon a mere technicality of form, to enforce upon another nation a claim manifestly in its essence unjust, and the law “enforceable ” in the legislature (of which we are in these cases advisers) is devoid of all technicality and is marked by an endeavor to secure absolute justice. Should it then appear upon the face of the proceedings in the prize court that a vessel was guilty of a breach of the law of nations, and therefore was justly condemned, we shall not feel ourselves debarred from so finding, because the specific reason for condemnation upon which the prize tribunal rest their result was not good in international law.
It is nowhere necessary for a court to state all their reasons for the decision they make, nor is it unusual to see two tribunals reach the same result by different arguments. The French courts were bound by the French municipal laws, and finding a French statute authorizing the result reached by them, it was unnecessary for them, in their j urisdiction, to go further. Wh en, however, the case comes into the forum of diplomacy the local statute is no longer a defense; it can not operate upon the international claim, as the very validity of the statute itself depends upon its accordance with the treaties existing between the countries or with the law of nations. If, then, the statute is invalid, and therefore the condemnation, if it rest specifically upon the statute, is on its face illegal, still it is the right of the defending nation to rely upon the facts appearing in the case and to urge that these facts justify a condemnation under any treaties which may be in force at the time or under the law of nations. So in this court, under this peculiar jurisdiction, the defendants are at liberty to show that, while the specific reason *204 set up by the prize court was not valid, as perhaps based upou a statute iu derogation of the law of nations, still other facts appeared which, while not pressed in the prize tribunal, constituted á good defense to a diplomatic claim. The United States here is entitled to the defenses which would have belonged to France at the time these claims were assumed.
The Joanna was a neutral vessel, laden with enemy cargo not contraband. She was seized and condemned because of a deficiency in herróle W equip age, an insufficient reason; but did the fact that she was laden with enemy goods authorize the condemnation 1 This is the question now presented, a question to be decided by the law of nations as then recognized, the treaties of 1778 between the United States and France having been abrogated prior to this seizure. (Hooper v. The United States, 22 C. Cls. R., 408.)
In an examination of the law of nations as it affects neutrals in time of war, we must begin with the two original propositions : First, that all nations have a natural right to absolute freedom of commerce; second, that a belligerent has a no less equal right to destroy on the sea the property of his enemy. In theory there is no reason why a war between other nations should affect a neutral; iu practice it does affect him, and necessarily, as we shall see, but it must always be remembered that the original and natural right of a neutral is to carry on his commerce freely and without impediment, his only duty being to show absolute i mpartiality and to avoid taking any part in hostilities as between the belligerents.
The natural law of freedom of commerce would permit dealing in arms, munitions of war, and supplies of immediate use to the military arm of the belligerent, subject only to the restriction of entire impartiality between the parties. What is sold the one belligerent should not be denied on equal terms to the other. The freedom of neutral commerce, however, inevitably clashes with the right of the belligerent to seize and appropriate to his own use the property of his enemy. These principles, in theory consonant, have in practice led to much discussion and conflict, from which certain modifications, by way of compromise between the two extremes, have been introduced into the law of nations, which now much abridges the natural right of free commerce; for example, by *205 prohibiting the carriage of contraband, and by forbidding the-attempt to violate an actual and effective blockade.
The first important enunciation of a compromise between-the two doctrines of freedom of neutral commerce on the one-side and the right to destroy enemy property on the other,, is found in the Consulato del Mare, which prescribes that a neutral vessel laden with enemy goods shall be taken to a. place of safety, where the enemy cargo shall be removed, and the neutral vessel, after receiving proper remuneration by way of freight, shall be free to depart. The compromise between-the two extremes is apparent. In the one hand, the neutral is-not materially injured, for his freight is paid; all that he could have received had his cargo been delivered at its destination is given him ; while on the other hand the capturiug belligerent has received all he could demand; that is, the property of' the enemy. The doctrine of the Consulato del Mare is free from anyquestiou of vicarious taint. The cargo does not affect the ship nor the ship the cargo. Each is judged upon its own-merits, and neither suffers from the fault of the other. The-seizure of enemy’s property was authorized, but the property of neutrals was protected even when the two were found together. A neutral vessel carrying enemy goods was esteemed innocent-, as were neutral goods upon an enemy vessel, subject only to this one infringement upon neutral rights, the delay necessary to separate the two and to secure to the belligerent the enemy property.
These principles were early recognized in a treaty made by England and the Duke of Burgundy in 1400, renewed in 1417,. 1426, 1478, and 1495; in the treaty between England and the Duke of Brittany in 1496; and in a treaty between England, and Genoa in 1460; and, while but few treaties in the sixteenth century relate to this subject, those which do relate to it recognize the principle of the Consulato del Mare, that enemy property only is subject to confiscation.
The seventeenth century was marked by a strong drift, towards fticreased freedom for neutral commerce as embodied in the free ship free goods theory. France early started in this direction iu a treaty with the Turks, made in 1604. A similar treaty w'as made (also with the Turks) by the Netherlands, in 1612, and during the early part of the seventeenth century *206 we find many treaties to the same effect, among them the treaty between England and Portugal of 1654, the treaty between England and France of November 3, 1655, and the treaty between England and Holland of July 21,1667.
Other treaties recognizing- the same principle might be cited, embracing, besides France and England, Turkey and Genoa, Spain and Holland. The most important of these was that of Utrecht, of April 11,1713, and of particular interest to us was our own treaty with France of 1778, from the principles of which in this regard as in others we retreated in the Jay treaty with England, although we still maintained our contention for a general admission of the dotrine.
It is important to our present inquiry to note that France was among the foremost in urging freedom of neutral commerce, and while in practice during the eighteenth century the doctrine of free ships free goods was but little observed, and is not yet in force, still, in theory, it was largely recognized as the true principle. That is, the natural right of the neutral freedom of commerce, secure from search and interruption of voyage, was recognized, on paper, as paramount to the belligerent right of seizing enemy property wherever found. There were exceptions to this; none more marked than that contained in the treaty of 1689 between Great Britain and Holland, in their alliance against France, which, to interrupt commerce with their common enemy, provided that all vessels with, their cargoes, no matter to whom belonging, should be lawful prize when found sailing into or out of the ports of France. Treaties such as this, made for a specific warlike purpose under peculiar and exceptional circumstances, can not be regarded as entitled to very serious consideration in an endeavor to discover the true condition of the law of nations at the time. This particular treaty was censured by Yattel and was recently condemned by Dr. Phillimore as “ a grievous violation of international law.”
The armed neutrality of 1780 sustained the principle of free ships free goods against the desire of England. In fact, while the doctrine of free ships free goods has not become part of the law of nations, diplomatic history shows the tendency of calm judgment during the last century was towards increased protection of neutral commerce.
*207 We have made this review for the purpose of ascertaining what at the close of the eighteenth century was the law of nations in respect to neutral vessels found at sea laden with enemy property. That is, what was the aggregate of the rules on this subject acknowledged at that time by Christian states as obligatory in their relations to each other, and to the subjects of each other (Woolsey). We do not intend to make any ethical distinctions, or to examine the questions discussed by the text writers, whether international law as a system is based upon consent and usage, or whether it springs from the law of nature. This is not .important for our present purpose, which is simply practical. The measure of responsibility indicated by the definition we have paraphrased is now sufficient.
In the wars of the seventeenth and eighteenth centuries many invasions of the rights of neutrals were committed by the belligerents. The English-Netherlands treaty is an example. But it is not so much in treaties that we find the flagrant breaches of international duty and responsibility as in the various municipal regulations of the belligerents. In 1-643 and 1584 French ordinances adopted the maxim que la robe fflennenii confisque celle fflami? This rule was changed in 1650, but in 1681 Louis the Fourteenth decreed that all vessels laden with enemy goods should be good prize, and this action was confirmed by the decrees of 1692 and 1704; but the regulation of October 21,1744, reversed this rule and decreed the return of the neutral vessel, although laden with enemy goods; of course after the enemy goods had been removed.
Yalin is authority for the statement that the rule in force in France between 1681 and 1744 was peculiar to that country and to Spain and that other nations followed the doctrine of the Consulate del Mare, to which France returned in 1744.
France also followed this doctrine until the 29 Nivose, year 6, when it was declared that the character of the vessel should be determined by the character of the cargo. But this regulation was repealed by the law of 23 Frimaire, year 8, and by the Consuls’ decree of the 29 Frimaire in the same year.
The municipal laws of the belligerents during the French Revolution can not be excused upon any theory but that of self-preservation. We have already examined them at some length in *208 our previous opinions upon the spoliations eases, and have shown that as a rule not only were they in violation of all sound and accepted principles of international law, but that they were admitted so to be. Both England and Spain paid for confiscations made by authority of these statutes, decrees, rgulations, or orders in council, and France in substance admitted their illegality.
Not only were vessels condemned for carrying enemy cargo not contraband, but also for attempting to enter an,enemy port not blockaded, for sailing from an enemy port, for carrying cargo the produce of an enemy country, or for not complying with local statutes prescribing a particular form of ship’s paper.
Such regulations can not be regarded as forming any part of the law of nations. They were not assented to by neutrals, nor did the belligerents themselves believe them to be of international force.
The carrying of enemy -goods by a neutral is a lawful act, “ and therefore can not induce the confiscation of the vessel.”' (Wheaton.) “ If we find an enemy’s effects on board a neutral ship we seize them by the right of war; but we are naturally bound to pay the freight to the master of the vessel, who is not to suffer by such seizure.” (Yattel.)
We conclude that, at the time the Joanna was condemned, a court, acting under the law of nations, untrammeled by local ordinances, would have ordered the confiscation of the enemy cargo, and would have freed the neutral ship with freight money as remuneration, together with compensation for any extra expense which the master might have incurred, and which was directly caused by the seizure.*

Authorities consulted : Vattel, Book 3, sec. 115; Valin, Sur 1’ordonnauce de 1681, L. 3, tit. 9, des Prises, art. 7; Hautefeuille Droits des Nations Neutros, Titles VII and X; Wheaton on Maritime Captures, pp. 71 et seq.; Dana’s Wheaton, sec. 443 et seq.; Wheaton, History of the Law of Nations, 111-114 ? Waite’s State Papers, Vol. I, p. 134; Jefferson to Genet, July 24, 1793; Jefferson’s Memoirs, III, p. 489; Jefferson to Livingston, Sept. 9,. 1801; Waite’s State Papers, Vol. IV, pp. 38, 47; Wheaton’s Reports (U. S. Supreme Court), Vol. II, App., Note I, 54-56; The Eastern, 2 Dallas, 34; The Marianna, 5 C. Rob., 28; The Atlas, 3 C. Rob., 304, note; Phillimore, III, CLXIX et seq.; Kent, I, pp. 124-130; Woolsey, secs. 170-175:: Wildman Institutes, Vol. II, p. 138.