Nott, J.,
delivered the opinion of the court:
The first question in all French spoliation cases is whether the American' owner had a valid diplomatic claim against France at the time of the ratification of the treaty of 1800; the second is whether this claim was one of those which were released for a valuable consideration by the United States to France. Not all spoliation claims were so relinquished to France. Some were provided for, or intended-to be provided for, by that or other treaties; some were exceptional claims, abandoned, intentionally or unintentionally, in the diplomatic vicissitudes of the time. (The Leghorn Seizures, 27 C. Cls. R., 224.)
The second article of the treaty of 1800 declared the inability of the ministers plenipotentiary to agree, and provided that these spoliation claims should remain intact for subsequent negotiation. The supplemental clause, appended to the treaty • by the First Consul at the time of the final exchange of ratifications, July 31, 1801 (subsequently approved and accepted by the United States, December 19, 1801), in substanceprovided that the second article should be retrenched, and that by this “retrenchment” these spoliation claims should be released or relinquished to France, in consideration of a reciprocal relinquishment of a public claim which France held against the United States. Out of this relinquishment of these private claims for a public consideration the responsibility of the American Government arose. (Gray’s Case, 21 C. Cls. R., 340; Hooper’s Case, 22 id., 408.)
In an ordinary document, whether it be a contract, statute, or treaty, the provisions are framed, or supposed to be, with due regard to each other, and the parts bear some relation to the whole. But in the treaty of 1800 the vital provisions, whereby France and the United States relinquished mutual demauds and discharged each other’s indebetedness, was not a part of the treaty as originally framed, but an addendum *81 thereto, entered into ten months after the signature of the treaty. Its purpose was entirely foreign to the thought or intent of the contracting parties when they framed and agreed upon the preceding articles. Undoubtedly it must be interpreted and construed with regard to the treaty of which it is an appended part, but none of the previous articles can be explained or modified by it; they must be interpreted with reference to each other, and the second article as it originally stood before the addendum came and swept it out of the treaty and its subject-matter out of existence. In a word, as the relinquishment of the American claims to France was not contemplated at the time when the treaty was framed, the supplemental article can throw no light upon the obscurity of its provisions; and in the ascertainment of the intent of the high contracting parties when they signed the treaty we must proceed as if the second article had remained a part of the instrument and those claims had continued to be held in abeyance as a subject for subsequent negotation.
Those claims, now known as spoliation claims, loosely and vaguely described in the second article as “indemnities,” “due or claimed,” were the first subject-matter disposed of by the treaty. With regard to them it was expressly declared that the contracting parties could not agree upon an adjustment at that time, but it was nevertheless agreed that the claims should be kept alive and be the subject of further negotiation “at a convenient time.” In other words, France would not then consent to pay these claims, but did consent that they should not lapse or be extinguished by an implied operation of the treaty. Nevertheless, though unwilling to discharge this indebtedness then, France was willing to dispose of all other demands then pressed upon her, and these claims, expressly reserved for further consideration by the second article and other claims disposed of by subsequent articles, were supposed to include all subjects of difference then existing between the two countries.
Accordingly the French Government agreed that the causes of difference — the depredations of French cruisers and privateers upon American commerce — of which the spoliation claims were the effects, should come to an end. The French Government also agreed that although the liability of France to pay “indemnities” to American citizens was not conceded by the treaty, nevertheless redress should be given so far as redress *82 would not involve tbe payment of money. That is to say, it was agreed that restitution should be made of all property which had been captured, or which might be captured, “before the exchange of ratifications,” if it still remained within the control of the French authorities.
This obligation of the French Government to restore property within its control was expressed by a phrase which has occasioned much confusion and misconstruction — “notyet definitively condemned.” “ Property,” says the fourth article, “ captured, but not yet definitively condemned, or which may be captured before the exchange of ratifications, shall be restored.” The idea was that if the French Government could restore the property it should; but if proceedings had come to an end in the French tribunals, judicial or administrative, and the property had thereby passed beyond the constitutional control of the French Government, the liability of paying for it should be a matter of future negotiation. A later provision of the treaty makes this clearer.
The treaty recognizes the fact that it was possible that, after its signature, property might be condemned “ contrary to .the intent” thereof, and “before the knowledge of this stipulation shall be obtained.”' For such illegal acts of its tribunals France acknowledged an additional liability. As to such property, the treaty provided that it should be restored if it could be; but if it could not be, it should be “paid for.'” (Article 4.) The liability thus conceded, for which France should respond in money, was not for the fault of its cruisers in violating the treaty of 1778 or the obligations of international law, but for the fault of its tribunals in disregarding the obligations of the treaty of 1800.
The treaty of 1S00, therefore, left these matters of difference in this plight: (1) All claims for captures and condemnations ■which the Ameriean Government, on the 30th of September, 1800, asserted to be illegal, were reserved for future negotiations; (2) all property so acquired which was still within the control of the French Government, that is to say, not yet “definitively condemned,” should be “restored/” (3) all property that might be subsequently condemned, contrary to the intent of the treaty, if not restored, should be “paid for; ” (4) and, inferentially, all claims not included in the foregoing classes should be abandoned.
It is manifest that the surrender of captured property would *83 not in all oases, if in any, make the claimant whole. A ship might have been fired into (many were) and cut to pieces in the capture or run ashore and wrecked in the hands of her captors, and handing over her hull and water-soaked cargo to her owners would not constitute full indemnity to them. A vessel bound from Surinam for Salem, laden with a costly cargo of coffee and spices, illegally captured and carried to a West Indian port, would still have a claim for detention and depreciation of cargo, though given up in conformity with the letter and spirit of the fourth article. In a word; a claim for indemnity was something more than a claim for restitution of property. France, therefore, did not exact as a condition to the restitution of property that it should discharge the claims of the owners. The claims for indemnities remained a subject for future negotiation by the express terms of the second article.
Remembering that the supplemental article has not yet been brought into the treaty, and that we are still construing the treaty as if the supplemental article had never been attached to it, the liabilities and obligations of France may be thus defined: All claims for indemnities arising out of alleged illegal captures and condemnations France agreed should be the subject of future negotiations. In the meantime, in certain designated classes of cases, there should be restitution of property, which, in the event of France being ultimately made responsible for indemnities, should be in the nature of payments on account.
At this point the supplemental article was brought into the transaction, and the United States thereby acquired benefits and assumed obligations which had not been contemplated or provided for by the treaty. By these obligations so assumed they became, to all intents and purposes, the debtor for the balance or residuum of the general mass of claims termed “indemnities” in the second article, but did not, by any reasonable construction of the supplemental article, guarantee that France should fulfill her treaty obligations, and that on her failure to do so they would become responsible for her default. All that the United States did was to assume for France those claims or balances of claims which otherwise would have remained a subject for future negotiation. Consequently the French Government might remain liable for many things con *84 cerning which the American. Government could not be charged with responsibility. Stated in other words, all that the United States assumed were claims, in whole or in part, which France then and there refused to pay; and the only obligation cast upon the United States by the transaction was to recompense their own citizens for claims or portions of claims for which France was legally liable, but as to which the French Government had then and there been released from the obligation of paying. This relinquishment of claims and consequent responsibility of the United States, of course extended no further than to claims then in existence — to depredations on American commerce before the date of the treaty. (The Schooner Jane, 23 C. C1s. R., 226.)
As before stated, the treaty of 1800, in its practical effects, divided the spoliation claims into three classes, of which the second was for property captured before the signature of the treaty,' but at that time not yet “ definitively condemned.”
At the time when the ratifications of the treaty were exchanged, July 31,1801, there was a large amount of property in this plight. Vessels and cargoes had been condemned and sold; bonds had been given by the captors, who had received their prize money; appeals had been taken by the American owners to higher courts, and jurisdiction of such cases had been so changed by French law as to leave the original tribunals absolutely without authority, compelling a resort to a new tribunal, the council of prizes.
The question which immediately arises with regard to all property “not yet definitively condemned” and all cases still pending in the French tribunals is, upon whom did the obligation of procuring restitution rest? The American claimants applied to their own Government to procure this restitution of their property, and their own Government appointed an agent and employed counsel for that purpose. In subsequent proceedings under the treaty of 1803 the counsel speaks of. this as the “American routine,” and intimates that if the American claimants had individually pressed their own defenses in the French courts very different results would have been obtained.
It can not, of course, be supposed that the fourth article in the treaty of 1800 would execute itself, or that the French Government would restore property to any person demanding it on his assertion that he owned it and was an American citi *85 zen. The treaty accordi n gly provided for tbis contingency, and declared upon wbat evidence property should be “restored” or “paid for.”
The treaty of 1778 (Article xxv) had exempted American vessels from search in time of war, and provided for their authentication by the following provisions:
“Akt. XXY. To the end that all manner of dissensions and quarrels may be avoided and prevented on one side and the other, it is agreed that, in case either of the parties hereto should be engaged in war, the ships and vessels belonging to the subjects or people of the other ally must be furnished with sea letters or passports, expressing the name, property, and bulk of the ship, as also the name and place of habitation of the master or commander of said ship, that it may appear thereby that the.ship really and truly belongs to the subjects of one of the parties, which passpoit shall be made out and granted according to the form annexed to this treaty; they shall likewise be recalled every year, that is, if the ship happens to return home within the space of a year.”
It was likewise agreed that such ships, being laden, are to be provided not only with passports as above mentioned, but also with certificates containing the several particulars of the cargo, and—
“the place whence the ship sailed, and whither she is bound, so that it may be known whether any forbidden or contraband goods be on board the same; which certificate shall be made out by the officers of the place whence the ship set sail in the accustomed form; and if anyone shall think it fit or advisable to express in the said certificate the person to whom the goods on board belong he may freely do so.”
The treaty of 1800 does not refer to the former provisions just quoted in set terms, but does repeat them in totidem verbis (Article iy). In immediate connection with the declaration that “property captured and not yet definitively condemned, or which may be captured before the exchange of ratifications shall be restored,” it provides that the restitution shall be “on the following proofs of ownership, viz: The proof on both sides with respect to merchant ships, whether armed or unarmed, shall be a passport in the form following.” Then are set out in the same language the forms of the passport and manifest for vessel and cargo appended to the treaty of 1778. These were the prescribed evidence upon which property should be restored or paid for. Only one exception is allowed, “ and if *86 sucb passport or certificates, or both, shall have been destroyed by accident or taken away by force, their deficiency may be supplied by such other proofs of ownership as are admissible by the general usage of nations.”
It was therefore made incumbent upon the American claimant entitled to restitution of property to bring into the proper French tribunal, judicial or administrative, the evidence prescribed, or, after having shown that it had been “destroyed by accident or taken away by force,” such secondary evidence as was in such cases “ admissible by the general usage of nations.” Whether the American plenipotentiaries were ignorant of the fact that a large proportion of the vessels illegally captured had not carried the passport and papers prescribed by the treaty of 1778, or whether it was deliberately intended that vessels which did not carry such papers, should be excluded from the benefits of the fourth article of the treaty of 1800 does not appear.
We say that the American claimant entitled to restitution of his property had to go into the proper F rench tribunal, for on the one haüd the treaty could not execute itself and on the other a treaty can not be executed by constitutional governments where personal rights' are involved by means of an imperial rescript. In these cases the American claimant had to produce the prescribed evidence that would entitle him to restitution, or by proper proof lay the foundation for secondary evidence, and then produce such secondary evidence of ownership and nationality as “ would be admissible by the general usage of nations.” The captors also had rights, the right to traverse the declaration that the vessel or cargo was American; the right to object that the evidence which the claimant produced was incompetent or insufficient. These conflicting rights would involve some form of trial, and such a trial would necessarily be in the tribunal having jurisdiction, original or appellate, of the property; i. e., jurisdiction to decree its restoration. The treaty became the law for the tribunals, and the tribunals became the instrumentalities for giving it effect. Thus, in the case of The Schooner Peggy (1 Cranch R.., 103), where, under the same article, a French owner was seeking restitution from an American cruiser, we have this administration of the treaty:
On the 23d September, 1800 (before the signature), a circuit court condemned a vessel as lawful prize; on the 2d October, 1800 (after the signature), the French claimant removed the *87 case to tbe Supreme Court by writ of error; during tbe December term, 1801 (after tbe ratification of tbe treaty)-, tbe Supreme Court decided that tbe judiciary were as much bouud as tbe executive to take notice of tbe treaty, and must reverse tbe original decree of condemnation, altbougb it was unimpeachable when made, and decree restitution of tbe property under tbe treaty, altbougb it was ratified subsequent to tbe condemnation.
And here it should be said that tbe French courts apparently reached tbe same conclusion. In the case of tbe ship John, Bladder, master, it ajipears that the vessel was captured on tbe 1st February, 1800, before tbe signature of tbe treaty. Being armed and offering forcible resistance, her capture was undoubtedly legal from tbe French point of view. Yet tbe council of prizes held in 1803, after tbe ratification of tbe treaty, that if tbe property bad been still intact, tbe owners would be entitled to it under tbe requirements of article 4; and that if tbe captors bad received any profit from tbe prize, restitution would be ordered as against them.
Beciprocally, tbe right to tbe restitution of property imposed an obligation. Tbe American claimant, having this remedy against tbe captors for at least a portion of bis demands, could not refuse it and insist upon another against tbe French Government at a later day. We have spoken, for simplicity and convenience, of tbe property to be restored as tbe treaty speaks of it, as if it were tbe captured vessel and cargo in kind. But in maritime law and prize proceedings vessels and cargoes are treated as perishable property; sales are directed by interlocutory decrees, and money or securities held by tbe court take tbe place of and become tbe property which is tbe subject of litigation. This was tbe practice of tbe French prize courts, and where restitution was ordered tbe bonds given by tbe captors were turned over to the owners. If, then, tbe second article bad not been retrenched, and France bad ultimately conceded a liability for tbe illegal captures and condemnations, the French Government would have been justified in saying that tbe American claimants should have proceeded against tbe captors so long as a jurisdiction existed in which they could - assert their treaty right to restitution. That such was tbe understanding of tbe two governments is shown by tbe almost contemporaneous treaty of 1803. “It being well understood,” *88 says the fifth article, “ that the claimant can not have recourse to the United States otherwise than he might have had to the Government of the French Republic, and only in ease of msuffi-cieney of the captors.”
If, then, France would have been entitled to have the remedy against the captors exhausted before she could be held responsible for their captures, much more may the United States insist upon the same defense, they having assumed no debt or obligation which the treaty of 1800 contemplated would be borne by the French Government or French citizens.
The contemporaneous decision of the Supreme Court in tlie caseof The Schooner Peggy (supra), rendered within three months after the final ratification of the treaty of 1800 against an American captor, seems conclusive upon the point that property was not “definitively condemned” by the decree of a prize court, if the claimant could have taken the ease by appeal to the jurisdiction of an appellate court. Whether a claimant exercised this right or not; whether the appellate jurisdiction was friendly or unfriendly, known or unknown; whether the course pursued by the Freneh courts was fair and judicial or such as to make the remedy hardly worth pursuing, are conditions which do not modify the effect of the treaty or affect the present liability of the United States. If a substantial right of appeal existed on the 30th September, 1800, the prior decree of a prize court did not on that day constitute a “definitive” condemnation of the property.
As some of the conclusions now reached may seem to conflict with the language of the court in the case of The Schooner Jane (23 C. Cls. R., 226), it is proper to say 'that the wording of that decision was of course intended to be restricted to the facts then before the court. In that case the capture did not occur until JDecember, 1800. On the 30th September, 1800, no claim against France by the owners of the vessel existed, and none consequently was relinquished to the United States. Nothing which is now said is intended to change or modify the decision which was then pronounced.
As to property, then, which was provided for by the fourth article, property which at the time of the signature of the treaty had not been condemned, the American owner was bound to do two things; he was bound to defend by producing before the French prize court the evidence prescribed by the treaty; and *89 be was bound to appeal if an appellate court was witbin bis reach. If be.did not produce tbe evidence prescribed by tbe treaty of 1800 as well as by tbe treaty of 1778, tbe loss was bis own responsibility; if after condemnation by a prize court an. appellate jurisdiction was open to him, bis property was not “ yet definitively condemned,” and, coming under tbe fourth article of tbe treaty, was to be restored by France, and consequently was not to be paid for by tbe United States. They were liable only for tbe indemnity to which be might be entitled after restitution of bis property.
We say “ a substantial right of appeal,” for tbe French Government could-not have proffered a fanciful or practically impossible remedy, and have insisted on a claimant pursuing it to a fruitless end; and where tbe French Government could not tbe American Government can not rely upon a mere pretense of tbe right of appeal as a meritorious defense. To have been “substantial,” tbe right must have been real, i. e., practically within tbe reach of tbe American master whose vessel bad been lawlessly seized and illegally condemned. From tbe disclosures made by tbe hundreds of cases that have come before the court it is apparent, on the one band, that substantial redress was witbin tbe reach of those claimants whose vessels bad been condemned by prize courts sitting in France, but, on tbe other band, that ordinarily none existed for those whose vessels were condemned in tbe West Indies or in some of tbe Spanish ports. There were, indeed, French statutes giving appellate powers to tribunals sitting in France to review tbe decisions of the provincial prize courts; but tbe American shipmaster whose vessel bad'been carried into a West Indian port, who bad been thrown into prison while tbe so-called prize proceedings passed to condemnation and sale and who was left penniless to find bis way back as best be could, after certainly weeks and sometimes months of delay, was not bound to sail around tbe world in search of an appellate jurisdiction in which be could seek restitution on behalf of his owners. For captures where there were no available means for obtaining restitution, the conclusion of tbe court is that tbe property must be regarded as having been “definitively condemned” by tbe court of first jurisdiction.
There was also a class of claims of American citizens against France which differed from tbe claims reserved by tbe second *90 article in this important fact, that concerning them France conceded and acknowledged a liability.
In the general lawlessness of French affairs during the first Republic the Government exercised its arbitrary powers almost as freely in matters which were international as in matters which were domestic. Accordingly it impressed propertybelonging to the citizens of neutral powers, sometimes by seizing supplies in French ports, sometimes by seizing a vessel on the high seas, carrying her into port, and compelling a quasi sale of the cargo. (The Sloop Martha, 27 C.Cls. R., 218). But these enforced punchases were not captures and condemnations. (Gray's Case, 21 C. Cls. R., 340). The French authorities always admitted a liability, and gave vouchers and receipts or made payment in money or in barter, though upon their own terms. There was that mingling in every such transaction of the elements of tort and contract which is not easily unraveled and often renders the treaty rights of an individual doubtful or obscure. The cases were not unlike many of our own forcible impressments during the civil war, cases in which there was no voluntary agreement on the part of the vendor, but in which the courts allowed his involuntary acquiescence to secure to him all the advantages of a sale by an implied contract.
In the early case of Russell (13 Wall., R. 623) it appeared that imperative military necessity required that some steamboats should be impressed into the public service and employed as transports for carrying Government freight. The military officers did not inted to appropriate the vessels, but they did intend to compel the masters and crews with the steamboats to perform the services needed. The owners yielded an unwilling assent, and the first question involved in the suit which was brought for compensation was whether the transaction was one of appropriation or contract. The decision of the Supreme Court was that it might be regarded as a case of implied contract.
It is manifest that in such cases the owners had to a certain extent an election — whether they would acquiesce in the enforced sale and take what they could get from the French Government, or whether they would stand upon their international rights, and seek indemnity for the illegal act and it alone. We find that this election was exercised in some cases; the *91 owners, through, their agent, the master of the vessel, accepted produce — ordinarily coffee — in exchange for the cargo, or took such vouchers or obligations or promises to pay as might be given to them. In others they refused, and treated the seizure as unlawful, and abandoned the cargo and sometimes the vessel under protest.
The language of the treaty relating to this class of claims— those which were to be regarded as founded in contract and not in tort — is exceedingly general, and in these words:
“Art. Y. The debts contracted by one of the two nations with individuals of the other, or by the individuals of one with the individuals of the other, shall be paid or the payment may be prosecuted in the same manner as if there had been no misunderstanding between the two states. But this clause shall not extend to indemnities claimed on account of captures or confiscations.”
The treaty makes no provision for the payment of these debts nor their ascertainment, and the fifth article is a mere declaration of a conceded obligation on the part of the French Government.
But by the treaty April 30,1803, the subject was again taken up, and the conceded obligations were, as it was then supposed, finally disposed of. Louisiana was purchased by the United States, and out of the purchase money a fund, fr.20,000,000, was set apart to discharge all claims of American citizens upon France designated in this treaty. The following are the provisions which relate to the subject now under consideration :
“Art. 1. The debts due by France to citizens of the United States, contracted before the 8th of Vendémiaire, ninth year of the French Republic (30th September, 1800), shall be paid according to the following regulations, with interest at 6 per cent, to commence from the periods when the accounts and vouchers were presented to the French Government.
“Art. 2. The debts provided for by the preceding article are those whose result is comprised in the conjectural note annexed to the present convention, and which, with the interest, can not exceed the sum of twenty millions of francs. The claims comprised in the said note which fall within the exceptions of the following articles shall not be admitted'to the benefit of this provision..
“Art. 4. It is expressly agreed that the preceding articles shall comprehend no debts but such as are due to citizens of the United States, who have been and are yet creditors of France for supplies, for embargoes, and prizes made at sea, *92 in which the appeal has been properly lodged within the time mentioned in the said convention 8th Yendémiaire, ninth year (30th September, 1800).
“Art. 5. The preceding articles shall apply only, 1st, to captures of which the council of prizes shall have ordered restitution, it being well understood that the claimant can not havé recourse to the United States otherwise than he might have had to the Government of the French liepublic, and only in the case of insufficiency of the captors; 2nd, tlie debts mentioned in the said fifth article of the, convention contracted before the 8th Yendémiaire, an. 9th (Sept. 30th, 1800), the payment of which has been heretofore claimed of the actual Government of France, and for which the creditors have a right to the protection of the United States; the said fifth article does not comprehend prizes whose condemnation has been or shall be confirmed.”
It will be observed that the payments provided for were limited to the creditors of France for supplies for embargoes and for prizes made at sea. It will also be observed that the supplies referred to were further limited to those which had been duly presented to the American Government, and were comprised in a conjectural note appended to the treaty, and where the creditors who presented them had a right to the protection of the United States. It will also be observed that payments for prizes made at sea were t'o be limited to cases where the council of prizes had ordered restitution and the captors were unable to respond. Finally, it will be observed that these articles carefully reiterate the declaration of Article vof the treaty of 1800, that “ This clause shall not extend to indemnities claimed on account of captures or confiscations.” In other words, the treaty of 1803 continues to draw the line between that class of claims which the United States had relinquished to France under the second article of the treaty of 1800 and thoseother classes of claims for which France had acknowledged a liability. ’
The facts upon which the present cases rest are, briefly stated, these:
On the 15th of December, 1799, the ship Tom sailed from Boston bound lor London. On the 13th of January, 1800, she was captured on the high seas by the French privateer Bole. The ship carried her proper passports and papers. The ground of seizure was that a portion of the cargo belonged to English owners. This court now finds, as the council of prizes found, that the suspicion was unjustifiable and the capture illegal. *93 While in possession of the prize crew the vessel was run ashore on the French coast to prevent a recapture by an English cruiser, and thereby, became a partial loss. Portions of the vessel and' cargo were saved. On the 23d November, 1800, the council of prizes rendered a decree reciting the facts, and directing restitution of all that had been saved from the wreck, as well as the ship’s papers, but without indemnity. Subsequently the decree was carried into effect. Portions of the ship and cargo had been saved, and a dividend of $44,093, derived from the sale, was ultimately divided among the American claimants.
The decree of the council of prizes is not before the court, but the results, reported by Brodhead and Tuck, indicate that the French tribunal, upon the evidence before it, reached two conclusions: First, that the cargo was all American property, and therefore not subject to condemnation; second, that the seizure, in the circumstances of the case, was justifiable, and should not subject the captors to damages.
We are inclined to think that both of these conclusions were sound. As was held in the case of the Caroline Wilmans (27 C. Cls. R., 215), an invoice consigning property to a consignee in a belligerent port, “ who is to pay freight and, charges,” raised not a legal presumption that the cargo was the property of the consignee, but a reasonable suspicion that it was belligerent property. A naval officer on the high seas must act sum-' marily; he can not examine witnesses; he is not bound to take the unverified explanations of the master as. absolute verity. He must judge from the documents which the consignor has furnished; and where they leave ownership a subject of reasonable suspicion the fault or misfortune is the owners’. At that day, when there was no telegraphic communication, and mail communication between England and America ordinarily involved months, merchants were in the habit of shipping their goods for a market. Ordinarily in such cases the shipper paid freight and charges, though a consignee was designated. Occasionally, and very rarely, an invoice or bill of lading notifies the master of the vessel that freight and charges are to be paid bythe consignee. Of course such an arrangement could exist between consignor and consignee, though the cargo remained the property of the former; but where goods were shipped in an exceptional mariner to a consignee in a belligerent port, who was to pay all the costs and .charges of transpor *94 tation, and with, no directions or reservations on the part of the consignor indicative of Ms ownersMp, a naval officer might reasonably suspect that the cargo was belligerent property, and take the vessel in, if he could not remove the cargo, to have the question determined by the proper tribunal. (The Ship Joanna, 24 C. Cls. R., 198.)
But in the present case another and new question is presented by the facts. It appears by the protest of the master, and likewise by the decree of the council of prizes, that the vessel was run ashore, or as the decree terms it, “stranded,’ to prevent her recapture by an English cruiser. If she had been recaptured she would have been restored to her owners. Had the captors the right to prevent this by the deliberate and voluntary destruction of the vessel?
From one point of view they had. A belligerent has a legal right to prevent property from falling into the hands of his enemy. Whether property so destroyed shall be paid for is a question of moral obligation. Yattel and other great publicists hold that it should be. But here the property would not fall into the hands of the enemy in the ordinary sense of the term, for on recapture it would revert to the American owners. Furthermore, a belligerent seizing a neutral vessel on the high seas upon mere suspicion is responsible for the act and for the consequences and for the vessel, and is excusable for a loss only where it is caused by an unavoidable casualty. The voluntary destruction of the vessel by the captors for their own ends and purposes — that is, to save themselves from becoming prisoners of'war — was in a measure justifiable; that is, it was not an offense or a casus belli, but it was an act for their own exclusive benefit, destructive of the neutral’s right to a judicial investigation. The act of such destruction, though not wanton, was not inevitable, and the cost of it should be borne by the party which caused it, and not by the innocent owners of the property.
This point apparently was not considered by the council of prizes. Be that as it may, only a decree of restitution was rendered, and the captors were not made to respond for their destruction of the vessel. The decree therefore did not discharge the claim for indemnity, and France remained liable for the loss, less the proceeds of the property that was restored, and to that extent the claimants are entitled to indemnity from the United States.
*95 It is proper to add that not all the points which have been here considered are presented by the record in these cases, but they have been before the court in others in which no opinion was delivered. The points intended to be determined by this decision are reduced to the following conclusions of the court:
I. The supplemental article of the treaty of 1800, by which the spoliation claims were released to France, not having been appended to the treaty until ten months after it was signed, can not be referred to to explain the preceding articles, though they may be referred to to éxplain it.
II. It was the purpose, at the time of signature, that the spoliation claims should be held in abeyance for future negotiation, but that all causes of difference should, for the time being, be disposed of.
III. The treaty, irrespective of the supplemental article, left the matter of difference in this plight: (1) All claims for cap>tnres and condemnations were reserved for future negotiation,' (2) all property Avithin the control 5f France, i. e., “ not yet definitely condemned,” AA'as to be “restored;” (3) all property “condemned” subsequently to the. signature of the treaty, if not restored, AA as to be “paid for; ” (4) all claims not included in the foregoing classes were abandoned.
IY. After the uretrenchment” of the second article and ratification of the treaty the responsibilities of the two governments were as follows: (1) For claims arising (i. e., for depredations committed) subsequent to the signature of the treaty, France was exclusively liable; (2) .for property Avhich at the signature of the treaty ivas unot yet definitively condemned,” France was liable to the extent of restoring the property if it could be restored; (3) for property “condemned,” after the signature of the treaty, France Avas liable to the extent of restoring or of paying for it if not restored; (4) for depiredations committed before the signature of the treaty, the United States were exclusively liable, unless at the time of the signature the property was u not yet definitively condemned,” in which exceptional cases the responsibility was shared by France; (5) for depredations committed in cases Avliere the owners had a right to restitution under the fourth article, the United States were liable to the extent of the unsatisfied right to indemnity.
Y. Partial redress by making restitution would not dis *96 charge claims for indemnity. Tliey were retained for future negotiation by the second article. Restitution would go to the quantum of damages, not to the right to indemnity.
YI. By agreeing to the supplemental article the United States assumed for France those claims, or balances of claims, termed in the second article “ indemnities,” which would otherwise have remained a subject for future negotiation, but did not thereby guarantee that France should fulfill her treaty obligations under article 4.
VII. Under the decision of the Supreme Court in the case of The Schooner Peggy (1 Cranch R., 103) it must be held that property was not u definitively condemned n by the decree of a prize court if a substantial right of appeal existed.
VIII. Where a right to restitution under article 4 existed, the owners were bound to assert it by producing before the French prize court the evidence prescribed by the treaty, and to appeal from an adverse decision if an appellate court was within their reach; and the claimant must show that it was asserted, and establish the balance for which the owners were entitled to indemnity. The United States are not liable where an American claimant, having a substantial right of appeal at the time of the signature of the treaty, neglected' to prosecute it.
IX. To have been substantial, a right of appeal mutt’have been practically within the reach of an American master whose vessel had been illegally condemned. For those claimants whose vessels were condemned by prize courts sitting in France substantial redress by appeal existed; for those whose vessels were condemned in the West Indies there was in most cases no remedy which they were bound to pursue.
X. In the cases of impressed property, classed in the treaty of 1800 (Article 5) as “ debts ” (as to which France always admitted a liability), the claimants had an election whether they would acquiesce in the enforced sale or stand upon their international rights and seek indemnity. Where they acquiesced, the United States are not liable.
XI. The treaty of 1803 provided for the payment of the various classes of claims 'as to which France acknowledged a liability in the treaty of 1800. ■
XII. In the last century the usage of American merchants was to ship goods for a market, the shipper paying freight and *97 charges. Where freight and charges were to be paid by a belligerent consignee, it was ground for suspicion that the goods were belligerent propert, justifying a seizure for judicial investigation.
XIII. A belligerent seizing a neutral vessel on the high seas upon mere suspicion is responsible for the act and for the consequences and for the vessel, and is excusable for her loss only where it is caused by unavoidable casualty. The voluntary destruction of the vessel by the captors running her ashore to save themselves from capture being an act for their own exclusive benefit, destructive of the neutral’s right to restitution of the vessel after removal of the suspected cargo, renders them responsible for the loss. Such a destructon, though not wanton, is not inevitable, and must be borne by the party who causes it.
XIY. A decree of restitution in such a case did not discharge the claim for indemnity. The owuters were entitled to the value of the ship and cargo less the proceeds of property restored to them.
The order of the court is that the findings and conclusions now filed in these cases be reported to Congress, together with a copy of this opinion.