Howry, J.,
delivered the opinion of the court:
The findings dispose of the suggested want of citizenship as to one of the original owners and determine as well the ultimate fate of the vessel and its cargo. The production by the claimants of certain papers on board the vessel at the time of the seizure and condemnation, and the memorandum relating to the future adjustment of the charge for general average and expenses attending the capture on settlement of the insurance, does not establish restitution. The sentence of condemnation antedated the treaty of September 30, 1800, and with nothing more tangible than a notice of a bare right to an appeal (which does not prove that such a step was actually taken or that the proceedings were in abejrance until another treaty) the record is insufficient to justify the conclusion that the property was *346 restored to its owners under the fourth article of the treaty of 1800, or otherwise, as the result of an appeal.
Open for consideration, then, is the legal effect of the decree as a definitive condemnation. Was it the duty of the owners, through the master as their agent, to exhaust their remedies in cassation so as to create a valid diplomatic claim against France?
The answer to the inquiry must be determined not merely upon the general rule that appeals should bo taken from the inferior to the superior tribunal, where there are appellate courts open, but also by the terms imposed by the decree, the action taken under it, and the conditions surrounding the master after the sentence had become final as to the prize court.
It appears that the ship Governor Bowdoin sailed from Boston December 13, 1796, bound-for Batavia. She arrived at Batavia May 30, 1797, where the master purchased a cargo of sugar and coffee and sailed for Boston. The vessel was captured September 1,1797, by the French cruiser Hirondelle and carried into the Isle of France (Mauritius). The vessel and cargo were libeled before the tribunal of commerce of the Isle of France and released; an appeal was taken by the captors to the tribunal of appeals of Mauritius, which condemned the vessel and cargo January 4, 1798. The grounds of condemnation were: Error in the ship’s passport, informality in the issuance of the róle d’équipage, failure to establish neutral ownership of the cargo, and, finally, a presumption only and not legal proof of neutrality as to the $28,000 on board arising from the invoice and bill of lading. Under the decree the vessel and cargo were turned over to the captors. On January 17, 1798, the master of the ship applied to the court to compel the captors to give security for the vessel and cargo, as required by the French law. The application was denied. Following this was an act nonsuiting the master in his opposition, with an order that the decree be executed, under which the property was sold.
In the explanatoiy statement subsequently presented on behalf of the master to the prize- court the illegality of the proceedings seem to us to be clearly shown. It was recited for the master that possession was ordered and the sale made *347 without leaving to him any assumed recourse, even if he should prove in France the neutrality of his vessel and cargo. The statement concluded with the declaration that the master ” having done everything in his power to obtain justice before the tribunal, before the colonial assembly, and the administrators, and not having succeeded, there remains no other course than to appeal to the seat of government and demand from the tribunals of France that justice which has been cruelly refused him in one of her colonies.” Here the history of the matter ends until, in the evolution of time, France being-relieved in the meantime from liability by convention between the two countries, the claim for indemnity is presented to a court of the United States for adjudication.
In some respects the case resembles that of the Federalist, considered at this term and held not to present conditions which excused the claimants from taking an appeal. There the ship was condemned • for carrying a cargo not deemed neutral. Here the neutral ownership of the cargo was pronounced insufficient. There the decree declared the ship’s papers were irregular. Here, also, the decree recites irregularity in the passport and the róle d’équipage. There, as here, no appeal was taken. But at this point the analogy ends. The prize court which condemned the Federalist sat in France. The tribunal which rendered the decree of condemnation in this case was distant from France about 9,000 miles. Cassation was at hand to afford speedy relief in the case heretofore considered. In the case now under consideration it was remotely distant. The remedy was reasonably certain for the one in the means taken to revise the decree of condemnation and to compel restitution if the appeal was successful. In this case a speedy hearing was not only improbable, but reparation made exceedingly uncertain by the means taken to make the judgment of the provincial court definitive. The case seems to be covered by the same state of affairs described by this court as applicable to hundreds of cases where substantial redress was within the reach of those claimants whose vessels had been condemned by prize courts sitting in France, but none existed for those whose vessels were condemned in the West Indies or in some of the Spanish ports, where American shipmasters had been thrown into prison while the *348 so-called prize proceedings passed to condemnation and sale, masters who were left penniless to find their way back as best thej’ could after months of delay, and who were not bound to sail around the world in search of an appellate jurisdiction in which they could seek restitution on behalf of vessel owners. (The ship Tom, 29 C. Cls. R., 68-89.)
Eliminating from consideration the fact that the master in this case was not thrown into prison — and the matter of distance, although he was 9,000 miles from France — yet he was deprived of every thing he possessed, his vessel and cargo sold, and all of his effects converted to the use of captors who did not in all probability return to France for years. The judgment was fulty executed. The substantial remedy was gone when the application to the court for supersedeas or security of some kind from the captors was denied. Had the master proceeded to cassation in France his appeal promised no practical method of reaching the property seized. An appeal had nothing to operate upon. It .is not a sufficient answer to say that the sale was void and that no title passed; that if the proceeds had been received by the captors they could have been compelled to disgorge. It was a part of the duty of the French Government to provide a remedy that would afford redress according to the usage and practice of courts meting out justice when the final judgment was pronounced.
Summarizing the defenses so urgently brought to our attention, it is contended that the owners in some manner recovered back their -vessel; that the claim was never presented to the State Department, and some of the original papers appear to be in the possession of the owners’ descendants; that the insurers were bound to paj^ without awaiting the result of the litigation in France, and that the records of the French courts are lost or destroyed, which if existing might show that the vessel was subsequently released. It seems clear to us, however, that the vessel was sold under the decree of the tribunal of appeals in the Isle of France; that security was refused bjr the provincial prize court; that the insurers paid under their contract, and that if the vessel had been released she and the original papers should have gone to the possession of the insurers.
It is the opinion of the court that the claimants have made *349 out their case and the contentions. urged on behalf of the Government have failed to establish a defense.
The case will be so reported to Congress, together with a copy of this opinion.