Howry, J.,
delivered the opinion of the court:
The vessel and cargo were captured and condemned in May, 1799. The ground of the condemnation material to be considered appears from the decree to have been that a part of the cargo consisted of horses “ which by the terms of the law are objects of contraband.”
The treat}’- with France of February 6, 1778 (8 Stat. L., art. 24), declared horses to be contraband. But that treaty was abrogated by the act of Congress of July 7, 1798, in the face of the French decree of 11 Nivose, year 3, repealing the order of May 9,1793, declaring that the treaty should govern France notwithstanding the conduct of England. So the matter in issue here, though intended to be settled by that treaty, became open to determination according to the usage of nations and the rules of international law. According^, the question is presented for the first time in the history of this litigation whether horses were contraband' per se under the law of nations at the time of the seizure, and if so, to what extent knowledge on the part of the shipowner of the presence on board of contraband articles involved the other part of the cargo and the ship.
Writers on international law are agreed that the act of carrying to an enemy articles directly useful in war is a wrong for which the injured party may punish the neutral taken in the act. But difficulties arise in defining what articles are contraband. Text writers' answer the inquiry variously. But it would appear to be the almost unanimous opinion of elementary writers and the declarations of prize ordinances that articles or material which by their nature are fit to be used in war come within the classification. The difficulty commences in attempting to reconcile the conflicting authorities respecting those articles equally applicable to use in time of peace as well as in time of war, and the consequences arising from the circumstances of transportation and capture growing out of the fluctuating usages of nations and texts of various conventions designed to give to those usages the fixed form of positive law.
The principal point in dispute is as to articles deemed to be of ambiguous or uncertain use when in the enemy’s country and in time of war. One class of writers contends for an *22 absolute rule that all articles are of such description. Another class contends that as to such articles, inquiry may be made into the circumstances of their presence for the purpose of determining- their probable use in the particular instance. The latter rule was unquestionably the British doctrine, recognized in her treaties, stated by her text writers, accepted by her statesmen, and enforced by her prize courts. Thus, provisions mig'ht become contraband according to the circumstances of their destination and intended use. (Halleck’s Int. L., 587.)
Parsons defines contraband, as settled by the practice of maritime nations, as “a trade with a belligerent, intended to provide him with military supplies, equipments, instruments, or arms.”
Great maritime powers, when engaged in war, have enlarged the list, and nations generally neutral have contracted it.
Grotius divides all articles of trade into three classes, to wit: Implements and material which, by their nature, are suitable to be used in war; articles of taste and luxury, useful only for civil purposes; articles which are of indiscriminate use in peace and war. Articles of the first class have always been considered contraband; those of the second class never; while those of the third class contraband according to the particular circumstances of war. Little objection has been made, says Halleck, to the foregoing classification, but it leaves the entire difficulty unsettled, as the question immediately arises with respect to what articles are to be assigned to each class and under what particular circumstances articles of the third class become subject to capture as contraband. (Halleck’s Laws of War, 577.)
An ancient ordinance of marine, dating as far back as 1681, provided that—
“Arms, powder, bullets, and other munitions of war, also horses and their furniture, which shall be transported for the use of the army, shall be confiscated on whatever vessel found and to whatever person they belong, whether subjects or aliens.” (Art. 2 of title 9, book 3, Ord. of Mar.)
Out of the mass of learning gathered b3r the commentators and rules announced from the bench from time to time, the weight of authority preponderates for the proposition that at *23 the time of the seizure of the Atlantic, horses were presumptively considered contraband according to the usage of most nations. Certainly, according to the understanding between this country and France, as far as it may be said any understanding existed between the two countries on the subject at that time, they were so considered.
The schooner was a vessel of only So tons burden, and there were 38 horses on board. They constituted a large part of the cargo. Tobago wras one of the West Indies group of islands. Whether it was a port of naval or military equipment is not clear; but it was a part of the United Kingdom, then at war with France. Aside from any absolute rule, the presumption must be, in the absence of proof, that such a shipment was destined for the military use of the belligerent adversary.
The mere presence of a contraband article on board ship as an incident of the voyage, without proof or circumstances sufficient to justify the belief that the shipowners or their agents knew they were carrying contraband in violation of the laws of neutrality, will justify seizure and withdrawal of the contraband article alone. If a substantial part of the cargo consists of contraband articles or materials, such articles or materials are not only liable to seizure, but the presumption arises that the voyage was undertaken in violation of the duty of a neutral and with intent to aid the belligerent adversary.
The great weight of authority is that knowledge on the part of the shipowner of the presence on board of contraband articles, or conduct on the part of officers of the ship showing that they knew of the presence of such articles, involves the whole ship. (Desty’s Ship and Adm., sec. 425; Kent’s Com., Vol. I, 143; Halleck on Int. L., 572; Hall’s Int. L., 693; Walker’s Int. L., 512; Am. and Eng. Encl. of Law, Vol. II, 476.)
France being justified in seizing the Atlantic and condemning the cargo and the vessel, a claim did not arise against that Kepublic.
It is ordered that the conclusions of the court be reported to Congress.