Howey, J.,
delivered the opinion of the court:'
The brig Juno, Smith, master, sailed on a commercial voyage in May, 1800, bound from New London to Barbados. While peacefully pursuing her voyage the brig was seized by a French privateer and taken into Guadeloupe, where both vessel and cargo were condemned by the French tribunal of commerce and prizes sitting at Basseterre. The vessel and cargo became a total loss to the owners. The grounds assigned for the condemnation appear bj^ the decree to have been that the sea letter was not such as prescribed by article 25 of the treaty of February 6, 1778, an informal agreement between the captain and his crew in place of the róle d’équipage, and the want of charter parties and invoices.
The spoliations of France having been surrendered by the treaty of 1800 in consideration of a release from France of her claims against the United States, we look to the proceedings of the French tribunals in the very beginning of our inquiries, when decrees are accessible, to determine the character of the alleged • wrongs. But in this case the United States have set up a defense outside of the decree, alleging' that a part of the cargo was contraband. This is permissible, inasmuch as the United States in assuming liability did not restrict themselves to defend for reasons only which seemed evident to the French. All defenses which those people had were not only reserved, but every other violation of the ¡neutral’s obligation remained open to inquiry.
The defense is that the presence of a few horses .on board made the vo3'uge illegal as to the ship.
After showing that a strictly accurate and satisfactory classification of contraband goods is impracticable, the Supreme Court has said that which is best supported by English and American decisions divides all merchandise into three classes: The first consists of articles manufactured .and primarily and ordinarily used for military purposes in time *470 of war; the second, of articles which may be and are used for purposes of war or peace, according to circumstances, and the third, of articles exclusively used for peaceful purposes. (The Peterhoff, 5 Wall., 28, citing Lawrence’s Wheat., 772-776, notes; The Commercen, 1 Wheat., 382; Dana’s Wheat., 629, note; Parsons’s Mar. Law, 93-94.)
u Merchandise of the first class, destined to a belligerent country or place occupied by the army or navy of a belligerent, is always contraband; merchandise of the second class is contraband only when actually destined to the military or naval use of a belligerent, while merchandise of the third class is not contraband at all, though liable to seizure and condemnation for violation of blockade or siege.” (The Peterhoff, supra.)
The true test as to articles in the second class in the absence of treaty stipulation is the underlying'object of the shipment. As in the case of provisions, for instance, where the real purpose is the supply of the enemy’s force, the voyage with such freight and going to a hostile port to supply the military needs of the belligerent army or navy is illegal. (The Commercen, 1 Wheat., 38; Halleck Int. L., 587.)
Writers on international law say that the probable use of articles is inferred from their known destination. Halleck (ante, 686) quotes Kent as saying that the nature and quality of the port to which the articles are going is not an irrational test. If the port be a general commercial one, it is presumed that the articles are intended for civil use. But if the predominating character of the place be that of a port of naval or military equipment it will be presumed that the articles were going for military use. * * *
c‘It is not an injurious rule which deduces the final use from the immediate destination.”
The same principle, says the same writer, is laid down by Sir William Scott, but the author further sajrs that the principle does not seem to have been followed out in the judge’s decisions.
In a recent case we held that the weight of authority preponderates for the proposition that at the time.of the seizure then being considered horses were presumptively deemed contraband according to the usage of most nations, and certainly *471 so according to the understanding between this country and France, as far as it maj7 be said any understanding existed between the two countries on the subject at that time.
It was further held that aside from any absolute rule the presumption was, in the absence of proof, that a consignment of horses constituting a large part of the cargo of a small vessel bound for an enemy’s port was destined for the military use of the belligerent. (The Schooner Atlantic, 37 C. Cls. R., 17.)
It was shown, however, in that case that though the treaty with France of February 6, 1778 (8 Stat. L., art. 24), declared horses to be contraband, the treaty was abrogated by an act of the American Congress of July 7, 1798, so that the treaty did not govern. We adhere to the result then reached, fully satisfied of its correctness, but here announce a more explicit rule where horses are a part of the freight.
Whether horses, being useful for purposes of war or peace according to circumstances, are or are not contraband in the absence of treaty stipulation should be determined by the purpose of the shipment and the objects to be attained in the transportation of such freight. ' The circumstances must determine the character of the voyage, and each case must turn upon the purpose, if in proof, and next upon the presumptions arising out of the conditions suggested by the evidence. Destination and particulars surrounding the transit ought, if horses be a part of the cargo, to determine the lawfulness of the undertaking or the illegality of the voyage.
The conflicting specifications as to what constituted contraband about the time of these seizures seems to us to make the rule adopted in The Peterhoff (supra) fairly applicable where the question arises as to horses. They are articles which may be and are used for purposes of peace as well as war. A rule which does not condemn such freight without something to infer an unlawful purpose in their transit is most reasonable and in line with the enunciations of many writers on international law who have considered the subject. Bynkershoek was of the number who opposed admission into the list of contraband articles which had a promiscuous use in peace and war, while Bluntschli, Hübner, and' Hautefeuille make distinctions, treating the prohibition as to horses to cavalry *472 mounts, but leaving it undetermined as to the use intended bjr tlie transportation. Some writers are on the other side of the question because of the practice of different nations at various times. The books abundantly show that the same nation, in its conventions with other powers at the same era, has sometimes placed an article in the category of contraband and sometimes taken it out. A recent English writer has shown that, since the commencement of her naval supremacy, Great Britain has with fair consistency adhered to the doctrine of Grotius — from whom the classification adopted by the Supreme Court in The Peterhoff was bbtained — and treats the discussions of Heineccius, Yattel, Valin, and other eighteenth-century writers as immaterial, because of two distinct doctrines existing among States, one identical with that of Grotius, while the other, barring things aneipifnis usus entirety, recognizing only arms and munitions of war as contraband. (Risley’s Law of 'War, 227.) In view of the classification adopted by the Supreme Court, and the fact that horses were not contraband in any operative treat}»' between this country and France at the time mentioned, and because of the extraordinary contradictions and inconsistencies defining contraband, we deem it the safer course to regard the rule declared in the case cited as authoritative where it relates to horses. The purpose to carry them to a belligerent for military use must be inferred from all the proof in the case before a transit of such freight can be regarded as illegal.
Barbados was not in a state of siege at the time of this capture, nor was it under blockade. It may have been garrisoned, but the record does not show it, nor does accessible history tell us. There is nothing to indicate that the island predominated as a port of naval or military equipment, although it may have been the rendezvous of British shipping. In the absence of proof the presumption can not be indulged under these circumstances that a small, unsubstantial part of the cargo like five horses (shown by the manifest) was intended for military use. Assistance of such limited nature and the inconsequential character of such possible service rebut any presumption that the articles were going with a highly probable destination to military use. Such a small number of horses would constitute “a sort of evanes *473 cent quantity ” of which no account can be taken; certainly not enough to condemn the ship for carrying contraband to the enemy for his militaiy necessities.
The seizure was not lawful as to the ship, and the owners had a valid claim of indemnity as to it. But the decree establishes that there ivas no documentation on board the vessel to show neutrality of the cargo nor yet ownership. The recitals of the decree not being controverted, and the decree having been rendered after the- abrogation of the treaty of 1778, the condemnation of the cargo was valid. (The Betsey, Wyman, 36 C. Cls. R., 256.)
The findings óf fact, with a copy of this opinion, will be certified to Congress.