Howry, J.,
delivered the opinion of the court:
After the abrogation of the treatj^ of 1778 between France and the United States the American schooner Atlantic sailed with a cargo consisting largely of horses for Tobago, and was captured on the high seas by a French privateer, canned before a prize court, and condemned for carrying contraband. Upon a claim under the act of January 20, 1885 (23 Stat. L., 283), for the value of the vessel and cargo this court held the condemnation valid (37 C. Cls. E., 17).
The questions now presented arise upon the claimants’ motion for new trial.
Error is alleged in holding that horses shipped at the time of the seizure and intended for the point of destination were contraband.
The decision of the court did not proceed to conclusions upon the statement that horses were presumptively contraband according to the usage of most nations, though that *195 .statement finds support in many writers on international law of recognized authority. But it was made to rest upon the presumption,'in the absence of direct proof, that horses constituting a large part of the cargo of so small a vessel, and bound for an enemy’s port, were destined for the military use of the belligerent.
Grotius, sometimes called the father of international law, declared the rule with reference to the time when articles useful for purposes either of war or peace should or should not be deemed contraband, and this classification was adopted in The Peterhoff (5 Wall., 28). In the recent decision of this court in The Juno, Smith (38 C. Cls. R., 465), the same rule was followed, and the distinctions made in such cases fully explained. This decision has been accepted as correct by all the parties to that case and duly certified to Congress.
After referring to the Atlantic, Ilowe (supra), it was said in the Juno that—
“Whether horses, being useful for purposes of war or peace, according to circumstances, are or are not contraband in the absence of treaty stipulation, should be determined by the purpose of the shipment and the objects to be attained in the transportation of such freight. The circumstances must determine the character- of the voyage, and each' case must turn upon the purpose, if in proof, and next iipon the presumptions arising out of the conditions suggested by the evidence. Destination and particulars surrounding the transit ought, if horses be a part of the cargo, to determine the lawfulness of the undertaking.”
The rule establishes the conditional character of a shipment of horses under the general principles of international law as of the time of these spoliations. Horses will not be considered contrabandear se; and notwithstanding many authorities hold them to have been at the time mentioned unconditionally so, we are strengthened in the conclusion that they were not by the action of France and the United States in the treaty preceding the seizure. That treaty declared horses contraband and was indicative of the intent of the two Governments to make certain that which by the law- of nations had been uncertain. The abrogation of the treaty by one of the high contracting parties revived the uncertainty. The treaty itself *196 would hardly have been necessary if the nations of the earth had been in accord upon the proposition.
It is contended that the court erred in holding that the burden of proof was on claimants to show that Tobago was not a port of naval or military equipment of Great Britain. What the court did say was that whether Tobago was a port of naval or military equipment was not clpar, but that it was a part of the United Kingdom, then at war with France, and that the presumption must be, in the absence of proof, that such a shipment was destined for the military use of the belligerent adversary. This statement is but the application of the holding of the court that the burden of proof of the illegality of the condemnation is upon the claimants. (Dolphin, Gove, 27 C. Cls. R., 276; Tom, Bailey, 29 id., 68; John, Blackler, 29 id., 408.)
Tobago is a small volcanic island. It contains 114 square miles, is 26 miles long, and 7£ miles wide at its widest place. There must have been agricultural uses for horses, by reason of the presence on the island of as many as 17,000 slaves. But it lies between Barbados and Surinam, and the British, having organized an expedition, in 1799 attacked the latter place. (2 Stephens’s History of the Wars of the French Rev., 96.) The horses in this case were carried in the spring of 1799.
The war between the French and the English in the West Indies was principally defensive on the part of the French. Expeditions, great and small, were equipped at the English islands and fitted out to capture the possessions of the French. Barbados was known as the key to the Antilles. It was the headquarters of the British from which the larger expeditions against the French set out. Admiral Jervis departed from that island to conquer Martinique. Abercrombie’s expedition was organized in the islands south o.f Guadeloupe and the fleet set out from Barbados. The expedition against St. Lucia, and which was to have been conducted against Guadeloupe, rendezvoused at Martinique. A new army arrived at Barbados in 1796. After the fall of St. Lucia the two expeditions against other islands set sail, one going to St. Vincent and the other to Grenada. (Id., 102.) The same author says that the British posts extended along a line of 300 miles, and that *197 horses were shipped from America to remount three old regiments; that in the spring of 1796 7,000 troops had been received by the British at St. Nicholas Mole, and at one time during that year there were over 15,000 British troops at that island. (Edward’s Hist, of West Indies.) Stephens again says that from 1798 to 1796 Great Britain had sent over 51,000 soldiers to the West Indies. The Encyclopsedia Britannica, in referring to Barbados, states that its prominence and accessibility made it important as a military station in the wars with the French and Dutch.
Reviewing- the situation from 1793 to 1801 in the light of history, there is hardly a phase of warfare, land or naval, that did not obtain in the West Indies. There was hardly a British seaport town of any importance that was not a naval or military station at which hostile expeditions were prepared and which was not used as a base to supply the needs of the army and navy of the great enemy of France. It is true that the British schemes of conquest against the French colonies of the west had largely succeeded at the time of this seizure, but Guadeloupe and Cayenne, with some smaller islands, were yet retained by the French, and in the'summer of 1799 Surinam was taken. During the years mentioned the extensive trade in horses more probably meant the supply and equipment of the belligerents than an intention to further the peaceful pursuits of agriculture on islands aflame with insurrection and war. So, according to the test which the rule supplies, we can not at this distance of time say that the decree of the prize court was wrong in declaring that a cargo so largely consisting of horses and going to islands in the possession of the British was contraband.
It is also contended that the court erred in holding that the portion of the cargo held to be contraband involved the whole ship.
That knowledge on the part of the shipowner of the presence on board of contraband articles or conduct on the part of officers of the ship showing that they knew of the presence of such articles involved the whole ship ivas held upon numerous authorities. (Desty’s Ship and Adm., sec. 425; Kent’s Com., Vol. I, 143; Halleck on Int. L., 572; Hall’s Int. L., *198 693; Walker’s Int. L., 512; Am. and Eng. Enel, of Law, Vol. 11,476.)
The exhaustive briefs of .the numerous able counsel who have attempted to show that the rule was of early origin and had no application at the time of this seizure are exceedingly interesting. English cases are cited where it appears that contemporaneously with the present confiscation the rule was not applied. Some of these authorities do indeed prove this, but others show a relaxation of the usage in such, cases for special reasons. Taken altogether, the leading cases establish a suspension for cause rather than an abrogation of the rule.
Two cases before our highest tribunal contain language sufficient to render unnecessary an analysis of the English cases. Both of these cases are substantially in line with Sir William Scott in the case of Ringende Jacob (1 C. Rob., 89), where hemp was condemned as contraband, but confiscation did not follow as to the ship. He said in that case that the carrying of contraband articles is attended with the loss of freight and expenses, except where the ship belonged to the owner of the contraband cargo.
In The Bermuda (3 Wall., 555), it was said that the rule condemning the ship was founded on the presumption that the contraband shipment was made without the consent of the owner being given in fraud of belligerent rights, or, at least, without intent on his part to take hostile part against the country of the captors, but yet must be recognized and enforced in all cases where that presumption be not repelled by proof. In The Peterhoff (supra), Chancellor Kent’s understanding of the rule is quoted with apparent approbation, followed, however, by the statement that in more modern times the consequence of forfeiture attaches only to the freight of the contraband in ordinary cases. The effect of the conduct of the captain was not extended to condemnation in view of all the facts, including the almost certain destination of the ship to a neutral port with a cargo for the most part neutral in character. But the rule itself was recognized as continuing in force, to be applied in all proper cases. These decisions, coming more than sixty years after the *199 seizure in the present case, do not affect the circumstances which justified the decree condemning the Atlantic.
French law, it is finally contended, should have operated to secure the release of the vessel, because if the horses were contraband the penalty was confiscation of the horses only. Regulations prescribed three-fourths in value of contraband merchandise carried to make the ship liable.
. The reglement of 1778 following the treaty excluded proofs or tokens of fraudulent conduct. Only those who acted innocently could claim the benefits of the treaty. Government officials by it had the right to stop all prohibited goods, supplying a certificate afterwards that they had made search. Good faith was required on the part of the neutral. The reglement did not mean that confiscation was limited to the contraband itself where there was guilty knowledge. The owners and their agents could not have acted innocently, because the character of the shipment was known to them all. The decree has not been shown to be illegal, and we will not disturb it.
Motion denied.