Weldon, J.,
delivered the opinion of the court:
The sloop Ralph, Montague, master, sailed on a commercial voyage on the 31st of December, 1799, from New London, Conn., for the British island of Tortola, laden with a cargo of which about one-half in value was horses, 32 in number.
She arrived at Tortola, landed her cargo, took on a return cargo, and sailed on a return voyage on the 2d day of February, 1800, bound for her home port, New London, Conn.
While pursuing her voyage she was seized on the high seas on the 6th day of February, 1800, by the French privateer Le Hasard, Captain Blandanare, and taken to St. Johns, P. R., where she arrived February 14, 1800. •
The papers were taken to Guadaloupe, where the vessel and cargo were condemned as good prize and sold, whereby the same became a total loss to the owners.
The grounds of condemnation were as follows:
1. That the affirmation at the bottom of the sea letter is not signed by any public officer.
2. That the vessel had no róle d’équipage.
3. That the cargo consisted of sugar, the product of the English island of Tortola.
The privateer which made the capture was held by the court to have no lawful commission, whereby the captors were deprived of all benefits of the prize.
The ship, before sailing on the first voyage, was chartered to the decedents of the claimants in this case, upon the agreement that if said ship was seized and lost the charterers should pay to the owners thereof the sum of $2,200, and in pursuance of that agreement they paid the sum of $2,223.10.
The owners and charterers were citizens of the United States.
The cargo of the Ralph on the return voyage consisted of sugar, and was owned by the charterers in the same proportion as their interests in.the vessel — to wit, one-third each.
*207 It is insisted on the part of the defendants that although the grounds of the decree were not sufficient to justify condemnation by the French tribunal, yet the fact that the ship on her outward voyage carried contraband of war — to wit, horses — that that fact was sufficient to justify condemnation, although not adverted to by the French court. This court, has held in many cases that where there exists in law sufficient ground to justify condemnation that fact is available in the defense of the United States, although it does not appear as one of the reasons of condemnation. As is said in the syllabi of the case of The Ship Joanna (24 C. Cls. R., 198):
“Though the ground of condemnation on the face of the decree be illegal, it is nevertheless the right of the defending nation to reply upon the facts of the case, and thereby justify the condemnation.”
Conceding that the outward cargo was in part contraband, does that affect the condition of the vessel on her return voyage so as to justify condemnation?
There was much discussion in the trial of this and kindred cases as to the state of the law at the end of the eighteenth century upon the question as to the legal effect of contraband on the ship and other property, belonging to the party who owned the contraband. It is not necessary to go into a discussion of that question in this case, as the result is dependent upon the view which the court has taken between the liability of the owners of the ship on the outward and return voyage.
The ship was captured on the return, after it had discharged the cargo of the outward voyage, and had nothing on board of a contraband character. The condemnation is sought to be maintained because of the character of the outward cargo.
Upon the general question of contraband it may be said: The transportation of contraband articles to one of the belligerents is in itself an assault for the time being upon the other belligerents, in the fact that it may furnish them with the weapons of war and thereby increase the resources of their power as against their adversary; and for that reason, upon the broad ground of self-preservation incident to nations as well as individuals, the parties against whom the quasi *208 assault is made have the right to defend themselves against the threatened blow by seizing the weapon before it reaches the ppssessipn and control of their enemy.
The seizure of contraband is not only punishment, but it is also prevention, and the paramount purpose of its exercise is prevention, just as in self-defense on the part of persons it is to protect; but when the act is accomplished, the damage suffered, and the danger passed, then the incidents of self-defense cease. The extent to which the right to seize may be carried in its effect upon other property belonging to the offending party depends upon a variety of circumstances and conditions. The effect of the seizure maj7- be confined to the contraband articles alone, but may extend beyond those to other property of the guilty party by way of punishment incident to the wrong of carrying contraband.
Upon that general doctrine of the subject of contraband there is a qualification which was recognized by the courts at the time the capture of this ship was made. The effect of that qualification is that the outgoing voyage must be free from the taint of fraud, and misrepresentation made or practiced bjr the persons in charge of the vessel upon the rights of the belligerents.
It is said in the case of The Brig Lucy (37 C. Cls. R., 100):
“Where the owners of a vessel were the owners of the cargo, the vessel, as well as the cargo, was subject to confiscation; and .where the vessel carrying contraband was falsely documented, or cleared for a false destination, or was guilty of fraud, the liability to confiscation attended the entire voyage — that is to say, from the home port back to the home port, and to the cargo on the return voyage, though it might be innocent.” (See also the decision in the same case, present term.)
To justify the condemnation in this proceeding it is not enough that the ship carried contraband on an outward voyage; it must appear that associated with that act there were other derelictions on the part of the captured vessel, in violation of the belligerent rights of the seizing party. In the case of Carrington et al. v. The Mechanics’ Insurance Company (8 Pet., 495) the court, in quoting from the case of The Neutralitet (1801, 3 Rob. R., 295), in speaking of the rule which confiscated the ship because of the contraband, said:
*209 “Tbe policy of modern times has, however, introduced a relaxation on this point, and the general rule now is that the vessel does not become confiscated for that act. But this rule is liable to exceptions. Where the ship belongs to the owner of the cargo, or where the ship is going on such service under a false destination or false papers, these circumstances of aggravation have been held to constitute, excepted cases out of the modern rule, and to continue them under the ancient rule.
“The cases in which this language was used were cases of capture upon the outward voyage. The same doctrine was afterwards held by the same learned judge to apply to cases where the vessel had sailed with false papers and a false destination upon the outward voyage, and was captured upon the return voyage. And, finally, in the cases of the Rosalia and the Elizabeth, in 1802 (4 Rob. R., note to table of cases), the lords of appeal in prize cases held that the carriage of contraband outward with false papers will affect the return cargo with condemnation.”
It will be seen by a reference to the Carrington case, in which there is a collection of the authorities on the subject of the effect of carrying contraband goods, that in order to justify seizure and condemnation on the return voyage it must appear that some fraud was committed in the way of false papers and false destination in the outward voyage. In this case it is not shown that anj^ fraud was practiced on the outward voyage, and failing in that element the court must hold that the vessel had been relieved of all responsibility on its return voyage incident to the transportation of contraband on its outward voyage, and that the claimants are entitled to indemnity. A copy of the findings and this opinion will be certified to Congress.