Howry, Judge,
delivered the opinion of the court:
The claims involved are those of insurers of a cargo belonging to the owner of a captured vessel. As the insurers can claim only as subrogees of the insured interest and have no other or greater right than their principals, the cause will be considered as if principals only were involved.
The findings show that the vessel sailed from New London, Conn., for Antigua, a military and naval port of Great *4 Britain, having on board a cargo consisting of 10 horses, which had diminished t; 7 at the time of the condemnation. The horses were not included in the invoice of the cargo belonging to the vessel owner. The decree of condemnation directed the sale of everything.
The traffic involved in the shipment of horses has heretofore been the subject of consideration by this court, leaving but little room for further discussion. In order to clarify whatsoever of confusion and doubt that has arisen, it is proper to advert to the conditions existing in thÍ3 and kindred cases now before the court and in other cases yet to come involving the same subject matter.
The right to an award is made to rest in argument by claimants largely upon tbe decision of this court in the Juno, Smith, 38 C. Cls. R., 465. Defendants rely upon the authority of the Atlantic, Howe, 37 C. Cls. R., 17; 39 Ib., 193.
In the Juno it was held that where five horses, constituting a small proportion of the cargo, were carried, the horses could not be regarded as contraband per se, but that the lawfulness of the undertaking was to be determined by the intent. It had been previously explained by the court in the case of the Atlantic that inquiry was necessary to be made into the circumstances in each case of the presence on board of articles useful in peace or in war for the purpose of determining the probable use to be made of the shipment at the port of destination. Accordingly, in the case last mentioned, where it appeared that 38 horses were being carried to the port of Tobago, one of the West Indies group of islands then in possession of the British, it was found to be the port of a country at war with France, and likewise a port of naval and military equipment, and that the presumption existed in the absence of all proof that such a shipment was destined for the military use of the belligerent adversary. This statement was but the application of the general holding of the court that the burden of proof of the innocent purpose was upon the claimants, under similar circumstances citing the Dolphin, 27 C. Cls. R., 276; the Tom, 29 Ib., 96; and the John, 22 Ib., 454.
There was nothing on the hearing of the cause of the Juno to indicate that the island whence the five horses were carried *5 predominated as a port of military or naval equipment, although the court thought it may have been the rendezvous of British shipping. In the doubt existing as to the unlawful intent the court made an award that the improper purpose was not manifested clearly enough to say that the neutral was engaged in the transportation of contraband.
Contraband has, been defined to be, as settled by the practice of maritime nations, a trade with a belligerent intended to provide him with military supplies, equipment, instruments, or arms, and this court has been obliged to recognize the fact that great maritime powers when engaged in war have enlarged the list of contraband articles, but nations generally neutral have contracted- it.
After the decision in the two cases upon which the respective parties rely the case of the Atlantic was presented again to the court upon the motion of the claimants for a new hearing. Our second decision discloses that the court refused to decide that horses were presumptively contraband, though the contrary rule is supported by many writers of international law. Defendants have occasionally renewed their objections to the deductions of the court denying the per se contraband character of horses when carried, but making the transportation of such live stock depend entirely upon the intent of the shipment.
Out of all the discussion where international law writers have been so much out of harmony we are more than satisfied that the transportation of horses in all cases must depend upon the purpose of the shipment.
The act conferring this jurisdiction requires the court to decide upon the validity of these claims and to receive “ all suitable testimony on oath or affirmation, and all other proper evidence, historic and documentary, concerning the same.”
History shows that some shippers in our country in the times which gave rise to these claims took advantage of the opportunity offered by the war existing between Great Britain and France to make money by shipping cargoes with the connivance of shipowners to carry on unlawful trade, and that some shippers sailed the seas to bring cargoes back to home ports for reshipment and sale abroad to effectuate *6 the purpose. This practice meant the acquirement and reshipment of goods to aid countries at war under cover of a neutral flag. History also establishes that immense profits Ayere made for the risks taken by neutral skippers by loading their vessels with articles of such nature as was most needed by the countries at war with each other and best calculated to serve the interests of that belligerent willing to pay the price. Horses were not infrequently added to invoices. Sometimes horses and other live stock, besides tar and munitions of war, were not disclosed by manifests or bills of lading and yet were carried' abroad for purposes of sale and profit. France complained that as England was the greater sea power and consequently in a position to enforce embargoes and blockades better than the French, the English profited almost exclusively by the violation on the part of some of our merchantmen and seamen of the neutrality laws. Considering the necessities of the island possessions of the English in the West Indies the temptation to trade in articles needed for military and naval use and equipment was very great.
France contended that horses were contraband as far back as 1681, which view was subsequently embodied in article 24 of the treaty between the United- States and France of February 6,1778, 8 Stat., 1, by the declaration that “horses and their furniture” were to be considered contraband. We agreed; but when our Congress abrogated the treaty containing the provision making horses and their furniture contraband irrespective of intent, the clause fell by the act of abrogation. It is pertinent to observe that Great Britain asserted the same doctrine at the time France was stipulating that horses were contraband. The whole matter was relegated to the conduct and customs of the nations of the earth by the act of July 7, 1798, which carried down article 24 with everything exceptional in the treaty of 1778.
When the cause of the Juno was presented the record was wanting in that proof to which we now advert and which we think establishes the unlawfulness of the intent respecting the carrying of horses to belligerent ports of naval and military equipment.
*7 Antigua was such a port and that island was the destination of this neutral. Like Martinique, it was held by the sword. Perhaps Martinique was the larger base, but history shows that in the early part of the year 1799 the English were preparing expeditions in the West Indies against the Spanish, then allied with France in the war with England. 3 Southey’s West Indies, p. 159. To,bago was surrendered to the British in 1793, and an expedition was immediately sent to capture Martinique. England succeeded and it is historical that the British declared that they must not only conquer Martinique but likewise dislodge their enemy from every one of the French possessions in that part of the world. Edwards’s Hist. of West Indies, ed. 1801, p. 440. Expeditions against St. Lucia, Trinidad, and Porto Rico were assembled in the lower islands and sailed after the British conquest of Martinique to subdue all the other islands. Forces were generally organized in 1799 not only in Martinique but in other islands in those seas to drive the French away.
This proof is very important in determining the objects of the trade with the islands by neutrals. It had not developed in this class of cases on this subject at the time of the presentation of the Juno. It was developed some 10 years ago, on the second hearing in the case of the Atlantic, and the court has uniformly adhered to the rule stated to be the presumptive purpose of shipments to the group of islands in the West Indies. It is a rule well sustained by authority. Chancellor Kent declared that the nature and quality of the port to which merchandise is being transported is not an irrational test in determining the intent of a shipment. Halleck’s Int. L., 586. The claimants are not entitled to an award.
The court has considered this case under intemational-law rules, and for that reason does not need to cite the case of the brig Lucy, 37 Ct. Cls. R., 100, nor the case of the sloop Ralph, 39 Ct. Cls. R., 204, as authority, because both of these vessels came under the inhibition of contraband under the existing treaty between this country and France. But in the first-mentioned case there is support given to the rule that it must “clearly” appear that where the transportation *8 includes merchandise, like horses, of the disputable class, they were intended for the use of the noncombatant portion of a community to form an innocent cargo.
The findings herein, together with a copy of this opinion, will be certified to Congress.